Katherine SINCLAIR, individually and as Mother and next friend of her minor son Daniel Reinhard, and Michelle Levshakoff, and Terry Reinhard, Plaintiffs,

v.

Yoshitaka OKATA, Kazuyo Okata and Yoshihide Okata, Defendants.

No. A93–0272–CIV (HRH).

United States District Court, D. Alaska.

Oct. 12, 1994.

William G. Azar, William G. Azar, A.P.C., Anchorage, AK, for Katherine Sinclair, Michelle Levshakoff, Terry Reinhard.

Robert L. Richmond, Richmond & Quinn, Anchorage, AK, for Yoshitaka Okata, Kazuyo Okata, Yoshihide Okata.

Jeffrey M. Feldman, Young, Sanders & Feldman, Inc., Anchorage, AK, for Discovery Master.

---

## ORDER

### (Motion for Partial Summary Judgment)

HOLLAND, Chief Judge.

Plaintiffs have moved for partial summary judgment on certain aspects of their complaint.[1] The motion is opposed. Oral argument has been requested and heard.

On June 4, 1993, Daniel Reinhard was bitten by Anchor, a two and a half year old German Shepherd dog. Daniel was two years old when he was bitten. Daniel's five year old sister, Michelle Levshakoff, witnessed the attack. It is a matter of dispute whether Daniel's mother, Katherine Sinclair, was present at the time of the attack or whether she arrived shortly afterward. Katherine Sinclair, individually and on behalf of minors, Daniel and Michelle, filed suit in the Superior Court for the Third Judicial District for the State of Alaska. The named defendants included Yoshitaka Okata, Kazuyo Okata and Yoshihide Okata. Defendants removed the case to federal district court. Jurisdiction was based on diversity. Plaintiffs are Alaska citizens. The Okatas are

---

1. Clerk's Docket No. 62.

citizens of Japan. Plaintiffs, joined by Daniel's father, filed an amended complaint with this court.[2] In their complaint, plaintiffs asserted causes of action based on negligence, strict liability, negligent infliction of emotional distress, and for loss of society and companionship. Plaintiffs seek compensatory and punitive damages.

■ Although some factual issues remain in dispute, there are many areas where there is no genuine dispute. It is not genuinely disputed that the Okatas owned the dog, Anchor, at the time that Daniel Reinhard sustained his injuries.[3] It is also undisputed that Daniel sustained his injuries when Anchor bit Daniel's face. Both sides to the dispute agree that on June 4, 1993, Yoshihide Okata, the 17 year old son of Yoshitaka and Kazuyo Okata, arrived home without keys to enter the home he shared with his parents. With nothing else to do, Yoshihide decided to look through the owner's manuals to the new van his parents had recently purchased. While examining the manuals, Yoshihide heard the family's dog, Anchor, in the fenced backyard crying. Anchor was a two and a half year old German Shepherd. Yoshihide brought Anchor into the unfenced driveway where the van was parked and ordered the dog to "stay." The dog was not leashed, but

Yoshihide stated that he believed Anchor would obey his command to stay. Yoshihide fell asleep in the van, with the dog still unleashed in the driveway. Yoshihide did not awaken until he heard Daniel Reinhard crying. He then spoke with Katherine Sinclair, Daniel's mother, who told Yoshihide that the dog bit Daniel.

There is also no dispute as to the fact that Anchor was involved in at least four previous biting incidents. On the first occasion, a young boy, Shane Perrins, was bitten after he approached Anchor in the Okata's yard.[4] Perrins did not require medical attention, as he received only minor scratches and a small cut on his head.[5] On another occasion, Mina Iinuma was bitten on the arm.[6] Ms. Iinuma's injuries consisted of one or two small holes in her elbow, which did not require medical attention.[7] The third biting incident involved Mizutaka Azuma. According to Azuma's declaration, he was bitten as he entered the Okatas' car after eating dinner with the Okatas.[8] Azuma went to a doctor and received three stitches to his ear.[9] A fourth incident involved Yumiko Seifert, who was bitten on her buttocks while she was a guest at the Okatas' residence.[10] Kazuyo Okata drove Seifert to receive medical treatment.[11] The physician's examination revealed "multiple bite marks", but there was

---

**2.** Clerk's Docket No. 27.

**3.** The Okatas list ownership of Anchor as one of the facts in dispute. Clerk's Docket No. 78(a) at 1, Defendants' Genuine Issues of Material Fact. In their opposition to plaintiffs' motion for partial summary judgment, however, defendants never contend the issue of ownership. Yoshitaka Okata has declared that he bought Anchor in February of 1993. Clerk's Docket No. 78, defendants' Exhibit A, Declaration of Yoshitaka Okata. Yoshihide Okata declared the same. Clerk's Docket No. 78, defendants' Exhibit B, Declaration of Yoshihide Okata. Kazuyo Okata also declared the same. Clerk's Docket No. 78, defendants' Exhibit C, Declaration of Kazuyo Okata. Yoshihide took Anchor to obedience classes when the dog was a puppy. Clerk's Docket No. 78, defendants' Exhibit B. The dog was kept in the family's backyard or in the family's home. Clerk's Docket No. 78, defendants' Exhibits A, B and C. The fact that defendants purchased Anchor and had custody of the dog suffices to establish ownership under the Municipal Code of the City of Anchorage. *See* A.M.C. 17.05.010(P) (1992) (" 'To own' an animal includes any one or

more of the following: having title to, keeping, harboring, having custody of, or having control of the animal").

**4.** Clerk's Docket No. 78, defendants' Exhibit D, Declaration of Misa Okata; defendants' Exhibit E, Declaration of Denise Perrins.

**5.** *Id.*

**6.** Clerk's Docket No. 78, defendants' Exhibit D, Declaration of Misa Okata; defendants' Exhibit I, Declaration of Mina Iinuma.

**7.** *Id.*

**8.** Clerk's Docket No. 78, defendants' Exhibit J, Declaration of Mizutaka Azuma.

**9.** *Id.*

**10.** Clerk's Docket No. 78, defendants' Exhibit C, Declaration of Kazuyo Okata.

**11.** *Id.*

no bleeding.[12] Finally, there is evidence of a fifth incident involving another child, Miwa Inoue, who sustained an injury to her face requiring one stitch.[13]

Beyond the bare facts of the four or perhaps five biting incidents, there is a marked dispute over the manner in which the incidents are characterized. Plaintiffs point to what they claim are five biting incidents to establish that Anchor had "dangerous propensities" and to establish that the Okatas had actual knowledge of Anchor's dangerousness. Defendants counter with evidence that each of the four admitted biting incidents were the result of natural instincts, not of any dangerous tendencies. They refer to the testimony of an expert who declared that each of the four biting incidents admitted to by defendants were the result of overstimulation, protective instincts and chase instincts.[14] In Shane Perrins' case, defendants point to the fact that many children were playing near Anchor and were possibly shooting toy arrows at him when Perrins approached the dog.[15] Defendants claim that the dog was merely excited by all the activity, and that he jumped on the boy because of the excitement, not because of any dangerous propensity.[16] The declaration of Perrins' mother includes an opinion corroborating this characterization.[17] Defendants next claim that the incidents involving Mina Iinuma and Mizutaka Azuma were caused by the people suddenly touching the dog. Both Iinuma and Azuma declared that they believed they were bitten because they surprised or frightened the dog.[18] Finally, defendants claim that the incident involving Yumiko Seifert was caused by Seifert getting too close to the dog's food, then running from the dog when he barked at her.[19] Seifert herself disputes this description of the event. She claims that she was bitten as she stood up from a table and crossed the room to examine some skis.[20]

Further dispute exists concerning the whereabouts of plaintiff Katherine Sinclair at the time her son, Daniel Reinhard, was bitten by Anchor. In their memorandum in support of the motion for partial summary judgment, plaintiffs claim that Katherine Sinclair was in her frontyard watching and supervising her children as the children were playing outside her yard.[21] Plaintiffs say that Ms. Sinclair was standing 10–15 feet away from her children when she saw Anchor running at Michelle and Daniel from the backside of the Okatas' van.[22] Sinclair apparently saw the dog stop within a foot of the children, then the dog turned and began to walk away.[23] The children disappeared behind the van.[24] Sinclair stated that she ran towards the children yelling, "[t]hat is an unfriendly dog".[25] While the children were behind the van, Anchor allegedly came at the children,

12. Clerk's Docket No. 62, plaintiffs' Exhibit P, report of examining physician Thomas Ligus, M.D.

13. Clerk's Docket No. 78, defendants' Exhibit G, Declaration of Sumie Mogami. It is disputed whether or not this was actually a biting incident. Defendants point to declarations to characterize Inoue's injury as the result of a collision between the child and Anchor where Anchor's teeth merely "puncture[d]" the child's face. Id. Plaintiffs point to the Animal Control Center's report, stating that Anchor jumped and bit the child. Clerk's Docket No. 62, plaintiffs' Exhibit L.

14. Clerk's Docket No. 78, defendants' Exhibit Q, Affidavit of Jane Spalding.

15. Clerk's Docket No. 78, defendants' Exhibit D, Declaration of Misa Okata.

16. Clerk's Docket No. 78 at 4, defendants' opposition to motion for partial summary judgment.

17. Clerk's Docket No. 78, defendants' Exhibit E, Declaration of Denise Perrins.

18. Clerk's Docket No. 78, defendants' Exhibit I, Declaration of Mina Iinuma; defendants' Exhibit J, Declaration of Mizutaka Azuma.

19. Clerk's Docket No. 78, defendants' Exhibit C, Declaration of Kazuyo Okata.

20. Clerk's Docket No. 67 at 8, plaintiffs' Motion for Partial Summary Judgment on the Issue of Defendants' Liability.

21. Id. at 3.

22. Id.

23. Id.

24. Id. at 4.

25. Id.

and Michelle kicked at the dog.[26] Sinclair then came around the backside of the van and saw Daniel on the ground.[27] Sinclair picked up her son and began running between houses knocking on doors to get help.[28]

Defendants deny that Sinclair was outside watching her children before the incident occurred. They point to reports of the physician and emergency room nurse who treated Daniel. The emergency report included a notation to the effect that Ms. Sinclair had stated that she was "sleeping on the couch" when the incident occurred.[29] Dr. Hall, the attending physician, stated in deposition testimony that he clearly recalled Sinclair saying that she was sleeping on the couch when the incident occurred.[30] Dr. Hall's memory of Sinclair's statements was corroborated by Barbara McIntire, the emergency room nurse who treated Daniel. McIntire stated that Sinclair said that she had been lying down on the couch when Daniel was bitten.[31] Defendants also cite the deposition testimony of Tiffany (Tina) Weatherton. Weatherton lived across the street from the Okatas.[32] She was watching the children off and on for about an hour before Daniel was bitten, and said that she did not recall seeing Sinclair outside with her children.[33]

There is also a dispute as to the events leading up to Anchor biting Daniel. As discussed above, Katherine Sinclair has stated that the dog Anchor began running at Daniel and Michelle, but turned away. Then, as the children disappeared behind the van, Anchor is believed to have followed the children as they disappeared behind the van. This time, Michelle supposedly kicked at the dog in a defensive maneuver, and Anchor then attacked Daniel. In contrast, defendants believe that Anchor was provoked either by Michelle kicking at him or by Daniel playing with him. They believe that the children approached Anchor, not that Anchor chased after the children. They cite Weatherton's deposition testimony that she saw Daniel approach Anchor and pet him twenty minutes before Daniel was bitten.[34] From this testimony, they infer that the children were attempting to pet the dog when Daniel was bitten.

Plaintiffs have moved for partial summary judgment on the issue of "liability".[35] The motion does not address the plaintiffs' claims for negligent infliction of emotional distress (Counts III and IV of their complaint) nor their claims for punitive damages or compensation for loss of society (Counts V, VI and VII of their complaint).

■ Summary Judgment may be ordered on the issue of liability alone even though there is a genuine issue as to the amount of damages. Fed.R.Civ.Proc. 56(c). In support of the motion, plaintiffs have made three arguments: (1) that defendants are liable on a theory of strict liability; (2) that defendants are liable under a negligence theory; and (3) that defendants are liable under a theory of negligence *per se.*

A court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling upon a motion for summary judgment, the court must first determine if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202

26. *Id.*

27. *Id.*

28. *Id.* at 4–5.

29. Clerk's Docket No. 78, defendants' Exhibit N, Emergency Room Report.

30. Clerk's Docket No. 78, defendants' Exhibit O, Deposition Testimony of John E. Hall, M.D.

31. Clerk's Docket No. 78, defendants' Exhibit P, Affidavit of Barbara McIntire, R.N.

32. Clerk's Docket No. 78, defendants' Exhibit M, Deposition Testimony of Tiffany Ann Weatherton.

33. *Id.*

34. *Id.*

35. Clerk's Docket No. 62 at 1.

(1986). A fact is material if proof of the fact would have the effect of refuting or establishing an essential element of the plaintiff's cause of action. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984).

### A. WAS ANCHOR A DOG OF DANGEROUS PROPENSITIES?

In *Hale v. O'Neill*,[36] the Alaska Supreme Court referred to "the doctrine of strict liability for injuries caused by a domestic animal with known dangerous tendencies."[37] The court in *Hale* made passing reference to the elements of an action for strict liability based on an animal's known dangerous tendencies. The court first noted that "an owner of a domestic animal becomes liable, regardless of fault, for injuries caused by the animal which stem from a vicious propensity, known to the owner."[38] In the same paragraph, the court described the elements of such an action as being: (1) the animal's owner knew or should have known of the animal's "dangerous tendency", and (2) that the dangerous tendency resulted in an injury to the claimant.[39] *Hale* is the only Alaskan case discussing the requirements for strict liability for injuries caused by dangerous animals. More elaboration of Alaska law is required on certain points to decide plaintiffs'

---

36. 492 P.2d 101 (Alaska 1971).

37. *Id.* at 102. *Hale* involved an appeal by the plaintiff of the trial court's decision granting summary judgment in favor of the defendant. *Id.* at 103. The facts of the case involved a "spirited gelding" which threw the plaintiff from the saddle after an uncontrolled run. *Id.* at 102. The lower court dismissed plaintiff's claim on summary judgment on the grounds that plaintiff was aware of any dangerous tendencies the horse had when he mounted the horse for a ride. *Id.* Plaintiff had ridden the horse six times prior and was aware that the horse had a tendency to take the bit in its mouth and run. *Id.* at 104. The court held that, although assumption of the risk was no longer a viable defense in Alaska, contributory negligence was available as a defense to a strict liability action. *Id.* at 103. The court held that plaintiff was contributorily negligent as a matter of law. *Id.* at 103–04.

38. *Id.* at 102.

39. *Id.*

40. Clerk's Docket No. 78 at 8, defendants' opposition to motion for partial summary judgment.

---

motion for partial summary judgment. This court, whose subject matter jurisdiction in this case depends on diversity only, must apply the law that it believes would be applied by the Alaskan courts.

The first issue presented under this theory of strict liability is whether Anchor had a dangerous propensity. Plaintiffs point to what they believe are five prior biting incidents to establish Anchor's dangerous tendencies. Defendants' response to this point is ambiguous. On one hand, defendants seem to argue that Anchor was not dangerous because he never intended to injure any of the biting victims. They write that, "viewed in the context of the reliable, competent evidence ... it is apparent that a reasonable jury would conclude that Anchor was not a dog with dangerous and vicious propensities."[40] They cite declaration testimony of some of the biting victims, who believed that Anchor was not "vicious"[41] or "aggressive"[42]. Defendants cite authority for the proposition that "the biting of a person by a dog upon provocation is not sufficient to establish a vicious disposition of the dog."[43] Defendants also state or imply, incorrectly, that the jury decides dangerousness in a strict liability situation.[44]

---

41. Clerk's Docket No. 78 at 18, defendant's opposition to motion for partial summary judgment (citing the declaration testimony of Denise Perrins, Exhibit E).

42. *Id.* (citing affidavit of Jane Spalding who reviewed the incident involving Miwa Inoue).

43. *Keane v. Schroeder*, 148 Ind.App. 131, 264 N.E.2d 95, 98–99 (1970).

44. Defendants cite authority holding that the question of whether or not an animal has a dangerous or vicious propensity is a question for the trier of fact. *Keane v. Schroeder*, 264 N.E.2d at 99; *see also, Giles v. Russell*, 255 S.C. 513, 180 S.E.2d 201, 203 (1971). As defendants point out, however, these two cases were negligence cases, not strict liability cases. In strict liability cases, the determination of whether an activity is abnormally dangerous is one for the court, not the jury. 7 Stuart M. Speiser, Charles F. Krause and Alfred W. Gans, *The American Law of Torts* § 19:2 at 8 (1990). Accordingly, if the issue is relevant at a trial, the court will make the determination of whether or not Anchor had dangerous propensities abnormal to its class.

Defendants' argument fails on this point because it overstates the requirements for a finding that a dog is dangerous. A dog does not have to show a tendency to inflict grievous injury for it to be dangerous. Plaintiffs note that "[a]ny knowledge of the animal's propensity to bite or attack, whether in anger or play, is sufficient [knowledge]."[45] In *Keane v. Schroeder*[46], cited by defendants, the court defined the term "vicious propensity" as:

> [A] propensity or tendency of an animal to do any act which might endanger the safety of person or property in a given situation. It is the act of the animal and not the state of mind of the animal from which the effects of a dangerous propensity must be determined. A dangerous propensity may, for example, be deduced from very playful conduct.[47]

Plaintiffs cite further cases in support of the proposition that a dangerous or vicious propensity is a propensity to injure persons, whether by anger, viciousness or playfulness.[48] This is the position taken in the Restatement of Torts as well.[49] It is likely that Alaska's courts would adopt this approach to assessing dangerousness of a domestic animal for purposes of strict liability. If Anchor did have a dangerous propensity, then it is immaterial whether this propensity was driven by anger, playfulness, affection or curiosity.

■ Defendants make a second type of argument which successfully raises a genuine issue of material fact on the issue of dangerousness. Throughout most of their briefing,

plaintiffs engage in a qualitative analysis of the dog's behavior to determine whether the behavior was dangerous. They look to the four, perhaps five, previous biting incidents as evidence of dangerousness. This type of analysis is misplaced in a claim for strict liability. In a strict liability case, the first inquiry is always whether the activity engaged in was *abnormally* dangerous.[50] Under the Restatement approach, "[a] possessor of a domestic animal that he knows or has reason to know has dangerous propensities *abnormal to its class,* is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm."[51] Prosser and Keeton concur:

> A possessor of a domestic animal is not subjected to liability for harm simply and solely because it resulted from a dangerous propensity of the domestic animal. To be strictly liable, the possessor must have known or had reason to know of a dangerous propensity or trait that was not characteristic of a domestic animal of like kind.[52]

Again, it is likely that the Alaska courts would adopt this approach to assessing dangerousness in cases dealing with strict liability for injuries caused by domesticated animals. The question, then, becomes: is the dangerous propensity abnormal? Here, defendants are able to present a genuine question of fact. In their introduction, defendants characterize the prior biting incidents as "behavioral responses common to all dogs."[53] Defendants' expert reviewed each

45. 3 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *The Law of Torts,* Liability Without Fault § 14.11 at 273 (2d Ed.1986).

46. 148 Ind.App. 131, 264 N.E.2d 95 (1970).

47. *Id.* at 103, quoting *Doe v. Barnett,* 145 Ind. App. 542, 251 N.E.2d 688, 694 (1969).

48. *Frazier v. Stone,* 515 S.W.2d 766, 768 (Mo. App.1974); *Jannuzzelli v. Wilkens,* 158 N.J.Super. 36, 385 A.2d 322, 325 (1978).

49. *See Restatement (Second) of Torts* § 509 cmt. c (1965) (indicating that the doctrine of strict liability applies even when "the animal is not vicious but has a dangerous tendency that is unusual and not necessary for the purposes for which such animals are usually kept.").

50. *See, e.g., Restatement (Second) of Torts* § 519(1) (1965) (stating the general principle that one who carries on an abnormally dangerous activity is liable regardless of fault for injuries caused thereby).

51. *Restatement (Second) of Torts* § 509(1) (1965) (emphasis added).

52. W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on The Law of Torts* § 76 at 542 (5th ed. 1984).

53. Clerk's Docket No. 78 at 2, defendants' opposition to motion for partial summary judgment.

of the four admitted biting incidents, and as to each one she concluded that Anchor's responses were "natural" or instinctive.[54] Plaintiffs offer no evidence, through expert testimony or otherwise, to refute the opinion of defendants' expert. It may indeed be true that Anchor's reactions in the four or five incidents were abnormal in the sense that they were not reactions typical of domesticated dogs, but plaintiffs have not established that point beyond any reasonable dispute.[55]

Summary judgment on Count II of plaintiffs' complaint is denied.

## B. NEGLIGENCE AS A MATTER OF LAW

Plaintiffs claim that defendants were negligent as a matter of law. Plaintiffs cite *Alaskan Village, Inc. v. Smalley*[56] as a case which outlines the framework necessary to establish negligence and which contains seven factors which establish the elements of a negligence case. A close reading of the case shows that it does not establish the elements of negligence in a dog-bite case. *Alaskan Village* addressed the question of whether the owner of a trailer park could be held liable for injuries inflicted on a tenant by the dog of another tenant. Plaintiff, a six year old girl, was a resident of Alaskan Village, a trailer park. Every resident of the park was required to sign a rental agreement which prohibited the tenants from keeping vicious dogs. Plaintiff's neighbor in the trailer park, Henry Scepurek, kept two pit bulls, in violation of the rental agreement. When Scepurek's dogs escaped from his yard and injured plaintiff, plaintiff sued the trailer park for negligent failure to enforce its rules prohibiting the keeping of vicious dogs by tenants. Plaintiff received a judgment against the trailer park at trial. On appeal, the issue was whether the Alaskan Village, a third party, had a duty to protect plaintiff from the dogs. The issue was not whether the dogs' owner owed plaintiff a duty, or whether the owner was negligent. Accordingly, this case does not establish the framework for negligence in a dog-bite case.

To succeed on their negligence claim, plaintiffs must satisfy the classic elements of a negligence cause of action: duty, breach, and proximate cause.[57] Section 518 of the *Restatement (Second) of Torts* is a helpful starting point for analyzing a negligence claim in a dog-bite case. Under the Restatement approach, there is no liability for harm done by a domestic animal unless the owner of the animal intentionally causes the animal to do harm or unless the owner is negligent in failing to prevent the harm.[58] The comments to the Restatement make it clear, however, that owners of domestic animals are

---

**54.** Defendants' Exhibit Q at 5–8, Affidavit of Jane Spalding.

**55.** Defendants also argue that, notwithstanding their possible strict liability, plaintiffs are barred from any recovery under the doctrine of comparative negligence. Defendants also argue that Katherine Sinclair's knowledge of Anchor's dangerous propensities "bars plaintiffs' strict liability claim". Clerk's Docket No. 78 at 22–23, defendants' opposition to motion for partial summary judgment. Defendants are plainly wrong on both of these claims. As to the latter claim, the Alaska Supreme Court abrogated the defense of assumption of the risk in cases involving strict liability for dangerous animals. *Hale v. O'Neill*, 492 P.2d 101, 103 (Alaska 1971). Even if this were not true, it cannot be said that Ms. Sinclair's knowledge of Anchor's dangerous propensities can be imputed to her two-year old son, Daniel. As to defendants' first argument, Alaska long ago abandoned the rule of contributory negligence. *Kaatz v. State*, 540 P.2d 1037, 1049 (Alaska 1975). By statute, Alaska is a pure comparative negligence state. AS 09.17.060. When one or more parties is at fault in an action, the court is required under Alaska law to instruct the jury to apportion fault. AS 09.17.080. The definition of fault includes strict liability. AS 09.17.900. Under Alaska law, any negligence of the plaintiffs would not bar their claim but would only diminish proportionately the amount they are entitled to receive in damages. Finally, defendants cite no case which holds that Ms. Sinclair's alleged negligence in failing to supervise her children would be imputed to Daniel. Nor do defendants cite a case where Michelle's alleged negligence in kicking at Anchor would be imputed to Daniel. Indeed, defendants do not claim in their brief that Daniel was negligent in any way. It is, therefore, unlikely that Daniel will be unable to recover if the jury finds defendants at least partially liable.

**56.** 720 P.2d 945 (Alaska 1986).

**57.** *Larman v. Kodiak Elec. Ass'n*, 514 P.2d 1275, 1279 (Alaska 1973).

**58.** *Id.*

"under a duty to exercise reasonable care to have them under a constant and effective control." [59] The Restatement sets the degree of care that must be exercised "commensurate with the character of the animal." [60] Of particular relevance to this case is the Restatement's language indicating that an owner is "required to realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm." [61] These principles from the Restatement provide the court with the standards by which it is possible to evaluate plaintiffs' negligence claim.

In their complaint, plaintiffs identified three acts of defendants alleged to be negligent: (1) letting the dog run loose so that it could leave the Okatas' yard and bite Daniel in another yard; (2) failing to adequately control and confine the dog; and (3) owning and retaining possession of the dog.[62] In the memorandum in support of their motion for partial summary judgment, plaintiffs claim that the Okatas were negligent in that they left Anchor "unattended, unleashed and unsupervised" at the time Anchor bit Daniel Reinhard.[63] Nowhere do plaintiffs distinguish among the three defendants in assessing their culpability. They merely assert that all defendants were negligent and that their negligence was the proximate cause of plaintiffs' respective injuries. The failure to assess each defendant's culpability makes resolution of the motion for partial summary judgment more difficult than it would be otherwise.

It seems clear, for example, that plaintiffs allege that Yoshihide Okata was negligent in bringing Anchor from the backyard to the frontyard, then leaving Anchor unleashed in the driveway while Yoshihide fell asleep in the van. It is unclear what Mr. and Mrs.

Okata are alleged to have done that constituted negligence.

 Plaintiffs have not established that Yoshitaka or Kazuyo Okata were negligent as a matter of law. To establish that Yoshitaka or Kazuyo Okata are liable for negligence, plaintiffs must show that these two were directly negligent and that their negligence was a factual and legal cause of a plaintiff's injuries. It is a well-recognized tenet of the common law that parents are not vicariously liable for the torts of their children.[64] Plaintiffs cite no case contrary to this proposition, nor does there appear to be any Alaska law to the contrary. Plaintiffs therefore cannot claim that Mr. and Mrs. Okata are vicariously liable for Yoshihide's alleged negligence. As to other ways in which Mr. and Mrs. Okata were negligent, plaintiffs do not provide allegations detailed enough to conclude that there are no genuine issues of material fact so that plaintiffs are entitled to summary judgment as a matter of law. As to entrusting the dog to Yoshihide on the day in question, there is evidence that Yoshihide was told by his parents to keep the dog in the backyard or on a leash and that they had reason to expect that their instructions would be followed.[65] Regarding the dog's training, there is evidence that the family took Anchor to obedience and training classes, something done by less than 10% of all dog owners in Anchorage.[66] And while it may be said that the dog should have been terminated after the first four biting incidents, the failure to have the dog put down was not negligence as a matter of law.

 Plaintiffs have made a stronger case for finding Yoshihide Okata negligent. The case against Yoshihide is stronger because it was Yoshihide who was directly re-

59. *Id.* cmt. e.

60. *Id.* cmt. f.

61. *Id.* cmt. h.

62. Clerk's Docket No. 1 at 2, plaintiffs' First Amended Complaint.

63. Clerk's Docket No. 62 at 15, plaintiff's memorandum in support of motion.

64. *Emery v. Emery*, 45 Cal.2d 421, 432, 289 P.2d 218 (Cal.1955); *Cynthia M. v. Rodney E.*, 228 Cal.App.3d 1040, 1042, 279 Cal.Rptr. 94 (Cal.Ct. App.1991).

65. Clerk's Docket No. 78, defendants' Exhibit C at 4, Declaration of Kazuyo Okata.

66. Clerk's Docket No. 78, defendants' Exhibit Q at 8, Affidavit of Jane Spalding.

sponsible for taking Anchor out of the secured backyard to the unfenced driveway. As already stated, Yoshihide did not have Anchor on a leash or otherwise constrained while the dog was in the driveway. Amazingly, Yoshihide then went to sleep, leaving the dog unattended. In defense, Yoshihide claims only that he ordered the dog to "stay" and that he believed the dog would obey his command.[67] Otherwise, Yoshihide admitted that he knew of at least one occasion where Anchor bit a child, Shane Perrins.[68] Yoshihide also admitted that, a few days prior to the incident involving Daniel Reinhard, he was "scolded" by his mother, who was "very serious" about his "carelessness" in allowing Anchor in the frontyard alone.[69] Yoshitaka Okata declared that he had given Yoshihide warnings about the dog after each of the other biting incidents, which indicates that Yoshihide had actual knowledge of all the other incidents.[70] Even without actual knowledge of the prior biting incidents, Yoshihide could be charged with constructive knowledge of the biting incidents.[71] In short, the evidence presented in the supporting affidavits and declarations points strongly to the fact that Yoshihide failed to restrain Anchor even though he knew that Anchor had a propensity to bite humans.

Given these facts, the conclusion that Yoshihide Okata acted negligently seems inescapable. There is no genuine dispute as to the facts showing that Yoshihide Okata had a duty to control Anchor, that he failed to do so carelessly, and that this conduct was a legal cause of injury to Daniel. No reasonable juror could conclude otherwise. Yoshi-

hide knew of four prior incidents where Anchor had bitten people, yet he brought the dog into an unsecured area then fell asleep. He was told by his parents to keep the dog in the backyard at all times, then disobeyed their instructions. It is true, as defendants claim, that it is rarely appropriate for a court to order summary judgment on the question of a party's negligence.[72] On the other hand, where the facts are such that there can be no reasonable dispute, summary judgment is warranted. This is one of those rare cases where a defendant's conduct so clearly falls below the applicable standard of care that it is proper for the court to rule as a matter of law that the conduct was negligent.

Defendants also argue that plaintiffs' own negligence was a cause of their injuries and that, but for plaintiffs' own negligence, the injuries would not have occurred. Defendants say that plaintiffs were negligent in two respects: (1) Katherine Sinclair was negligent in allowing her children to play outside while she was asleep on the couch; and (2) Michelle was negligent in kicking at the dog. As pointed out in the plaintiffs' reply brief, however, such arguments do not prevent a finding that Yoshihide is liable for Daniel's injuries as a matter of law. In essence, defendants argue that, but for plaintiffs' negligence, Daniel would not have been bitten. This approach confuses the proximate cause element of a negligence claim. The Alaska Supreme Court held in State v. Abbott[73] that a defendant's conduct could be a legal cause of the plaintiff's injuries even when the plaintiff's own negligence also contributed to the

---

67. Clerk's Docket No. 78, defendants' Exhibit B at 4, Declaration of Yoshihide Okata.

68. *Id.* at 2.

69. *Id.* at 4.

70. After the incidents involving Shane Perrins and Miwa Inoue, Yoshitaka Okata told his children to keep small children away from Anchor and to keep Anchor on a leash when in public. Clerk's Docket No. 78, defendants' Exhibit A at 2, Declaration of Yoshitaka Okata. Yoshitaka gave similar instructions after the incidents involving Mizutaka Azuma and Mina Iinuma, this time requiring Anchor to be kept in the fenced backyard. *Id.* After the incident involving Yumiko Seifert, Mr. Okata told the family that the dog would be destroyed if there were any further

incidents. *Id.* This time, he instructed the family to keep Anchor under control at all times and not to let strangers into the house with Anchor. *Id.* at 2–3.

71. *See Hunt v. Hunt,* 86 N.C.App. 323, 357 S.E.2d 444, 446 (1987), *aff'd,* 321 N.C. 294, 362 S.E.2d 161 (1987) (implying that if one family member has notice of a dog's dangerous propensities, the other family members have notice as well).

72. *Arney v. United States,* 479 F.2d 653, 660 (9th Cir.1973).

73. 498 P.2d 712 (Alaska 1972).

injuries. Defendants' argument does not negate the third element of a negligence claim, causation.

 To conclude this section, the court finds that summary judgment against Yoshitaka and Kazuyo Okata on the issue of negligence is not appropriate because there are genuine issues of fact regarding whether Mr. and Mrs. Okata failed to conform to the standard of care imposed on them as Anchor's owners. On the other hand, the court finds that, as a matter of law, plaintiffs have established that Yoshihide Okata was negligent. As to this there is no genuine dispute as to material facts. Owners of domestic animals have a duty to exercise reasonable care to prevent their animals from harming others. No reasonable juror could find otherwise than that Yoshihide breached his duty of care when he took Anchor out of the backyard then left the dog unrestrained and fell asleep. Further, no reasonable juror could find that Yoshihide's negligence was not a legal cause of the injuries suffered by Daniel.

## C. *NEGLIGENCE PER SE*

The parties debate the legal effect of a violation of a municipal ordinance. Plaintiffs claim that violation of an ordinance establishes negligence *per se.* Defendants take the position that violation of an ordinance is only evidence of negligence, not negligence *per se.* Both parties cite *Ferrell v. Baxter,*[74] an Alaska Supreme Court case. Plaintiffs cite the case for the proposition that the unexcused violation of a statute, regulation, or ordinance is negligence *per se.*[75] Defen-

dants look to other language of the opinion where the Alaska Supreme Court seemingly left it to the discretion of trial courts to decide whether violation of a statute or ordinance should be regarded as a breach of the standard of care or merely as evidence of such a breach.[76]

 *Ferrell* established a two-step inquiry for trial courts to follow when asked to instruct a jury that violation of a statute or ordinance establishes negligence as a matter of law.[77] The court first applies the four criteria outlined in the *Restatement (Second) of Torts* § 286, to determine whether the statute or ordinance was designed to cover the conduct in question.[78] If the court finds that the statute or ordinance does cover the conduct in question, it then considers whether the rule of law is so obscure, outdated, or arbitrary as to make inequitable its adoption as a standard of reasonable care.[79] If the statute or ordinance covers the conduct in question, and if it is not too obscure, outdated or irrational to operate as a standard of reasonable care, the court will instruct the jury that violation of a statute establishes negligence *per se.*[80] Otherwise, the court may, in its discretion, either admit the statute or ordinance as evidence of negligence or it may exclude reference to the statute altogether.[81]

 The focus of plaintiffs' opening brief was that defendants failed to comply with an Anchorage Municipal Code (A.M.C.) section requiring dog owners to report biting inci-

---

74. 484 P.2d 250 (Alaska 1971).

75. *Id.* at 259–60.

76. *Id.* at 259, *citing Meyst v. East Fifth Ave. Serv., Inc.,* 401 P.2d 430, 435–36 (Alaska 1965).

77. *See State Mechanical, Inc. v. Liquid Air, Inc,* 665 P.2d 15, 18–19 (Alaska 1983) (outlining the two step process to be followed by Alaska courts in deciding whether violation of a statute or ordinance is negligence *per se* ).

78. *Id.* at 18. The Restatement provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative reg-

ulation whose purpose is found exclusively 'or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

*Restatement (Second) of Torts* § 286 (1965).

79. *Id.* at 19.

80. *Ferrell v. Baxter,* 484 P.2d at 264.

81. *Id.* at 265.

dents to the Animal Control Center.[82] Plaintiffs argue that, had each of the four admitted biting incidents been reported, Animal Control would have designated Anchor a vicious dog under Alaska state law.[83] Having been designated a vicious dog, ownership of Anchor would have been illegal and Anchor would have been put down pursuant to the Anchorage Municipal Code.[84] Of course, had Anchor been put down, he would not have been alive to bite Daniel. Alternatively, plaintiffs argue that if the Okatas would have reported the four prior biting incidents, Anchor would at least have been designated a "dangerous" dog.[85] As owners of a dangerous dog, the Okatas would have been obligated to keep Anchor in a six-sided enclosure while on their property; and Anchor would have been restrained by a leash, muzzled, and under the supervision of an adult while off the Okatas' property.[86]

Defendants made a number of persuasive arguments against the above negligence *per se* claim, the majority of which do not need to be analyzed at this point. It is the view of the court that, as a matter of law, it could not be said that the failure to report prior bites by Anchor was a proximate cause of Daniel's injury. The Anchorage reporting ordinance is irrelevant to this case. Moreover, while the reporting ordinance places a duty upon dog owners, it does not set out a standard of conduct for dog owners.

In their reply memorandum, plaintiffs changed the focus of their argument to A.M.C. § 17.10.020(A) (1986), which does mandate a standard of conduct requiring that "[a] person who owns a dog or a cat shall keep that animal under restraint at all times." At oral argument, defendants made several arguments against adopting A.M.C. § 17.10.020(A) as the standard of care. After hearing those arguments and plaintiffs' responses, this court concludes that it should instruct the jury that violation of A.M.C. § 17.10.020(A) amounts to negligence *per se*. Given this instruction, the jury would be further instructed that it must determine whether any of the defendants violated A.M.C. § 17.10.020(A) and whether violation of the ordinance was a cause of plaintiffs' injuries.

At oral argument, defendants denied that the purpose of A.M.C. § 17.10.020(A) is to prevent animals from causing injuries to people. They argued that the ordinance is designed to prevent animals from becoming a nuisance. They pointed to similar language in older versions of the Anchorage Municipal Code that prohibited animals from roaming at large. They also pointed out that A.M.C. § 17.10.020(C) takes specific measures against attacks implying that, as a more specific provision, this subsection establishes the standard of care. Defendants also alluded to a statute or ordinance that makes violation of A.M.C. § 17.10.020(A) a public nuisance, although the court was unable to locate that statute or ordinance. Next, they noted that A.M.C. § 17.10.020(A) applies to cats as well as dogs, and since cats are not considered dangerous, the subsection must be intended to prevent these animals from becoming a nuisance. Lastly, they argued that adopting A.M.C. § 17.10.020(A) as a standard of care would lead to absurd results, such as when a guest in a home is injured late at night by a dog that is in the home but unleashed.

Even if defendants are right in arguing that the subsection was designed to prevent animals from becoming a nuisance, the court concludes that the subsection was also designed to prevent animals from causing personal injury to others. Read as a whole, the Anchorage ordinances pertaining to dog control are unequivocally aimed at preventing attacks and bites by dogs. On facts similar to this case, involving a statute similar to the ordinance in question here, the court in *Miller v. Hurst*, 302 Pa.Super. 235, 448 A.2d 614, 618 (1982) concluded that the statute was "intended to protect the public from personal injury, property damage and other hazards created by roving dogs." Applying the factors listed in *Restatement (Second) of Torts*

---

82. A.M.C. § 17.30.010(A) (1992).

83. AS 03.55.020 (1983).

84. A.M.C. § 17.50.020(D) (1992).

85. A.M.C. § 17.05.010(W) (1992).

86. A.M.C. § 17.40.020(A)–(C) (1992).

§ 286 to the ordinance, the court finds that A.M.C. § 17.10.020(A) was designed to cover the conduct in question in this case. Moreover, nothing indicates that the ordinance is so obscure, outdated or irrational as to make it inequitable for this court to adopt it as the relevant standard of care. Therefore, the court concludes that a jury hearing this case would be instructed that violation of A.M.C. § 17.10.020(A) would constitute negligence as a matter of law.

 Having concluded that a jury hearing this case would be given a negligence *per se* instruction, the next question is whether plaintiffs are entitled to summary judgment based upon any defendant's violation of the ordinance. Given the current record, it can at least be said that there is serious disagreement as to whether Yoshitaka and Kazuyo Okata violated the "leash" law in question. As with the negligence claim, plaintiffs cannot hold Mr. and Mrs. Okata vicariously liable for their son's alleged negligence. On the day Daniel Reinhard was bitten, neither Yoshitaka nor Kazuyo Okata left Anchor unrestrained so as to violate A.M.C. § 17.10.020(A). When Mr. and Mrs. Okata left home, Anchor was in the fenced backyard. For purposes of the municipal code, the term "restraint" includes physical confinement by leash, chain, fence, or building.[87] Under this definition, Anchor was restrained when the Okatas left for the airport.

 As to Yoshihide Okata, however, the undisputed facts indicate that he did violate A.M.C. § 17.10.020(A). Yoshihide Okata returned home, released Anchor from his yard and then slept while Anchor was left unleashed and unconfined.[88] The Anchorage Municipal Code provides that the definition of "restraint" is not limited to physical confinement, however. Instead, an animal is restrained for purposes of the Code when it is under competent voice control on the property of the owner.[89] Even under this definition of "restraint", Yoshihide violated the code. To meet the definition of competent

voice control, the animal's owner or caretaker must be present to monitor the animal's activities, must be capable of directing all of the animal's movements by vocal commands, and the animal must follow the commands quickly and accurately.[90] Clearly, Yoshihide was unable to monitor or direct Anchor, as he was asleep. Even if Yoshihide had been in a position to monitor the dog, the definition of competent voice control would not have been met, since an animal is deemed not to be under competent voice control if it attacks a person.[91] Given the definitions of restraint in the Anchorage Municipal Code, Anchor was beyond dispute not restrained when Daniel was bitten. Yoshihide, therefore, violated A.M.C. § 17.10.020(A).

All defendants had a duty to follow A.M.C. § 17.10.020(A), Defendant Yoshihide Okata's failure to obey this ordinance constituted negligence *per se*. Causation, as stated, is established beyond any reasonable dispute. Again, Yoshihide is therefore liable to Daniel as a matter of law.

## CONCLUSION

Plaintiffs' motion for summary judgment on their strict liability claim is denied. Plaintiffs' motion for summary judgment on their negligence and negligence *per se* claims is granted in part and denied in part. As to claims for negligence against Yoshitaka and Kazuyo Okata, the motion for summary judgment is denied. As to the negligence claim against Yoshihide Okata, the motion for partial summary judgment on the question of liability is granted. The court will instruct the jury hearing the case that violation of A.M.C. § 17.10.020(A) constitutes negligence *per se*.

87. A.M.C. § 17.05.010(S)(1) (1992).

88. A.M.C. § 17.05.010(S)(1) (1992).

89. A.M.C. § 17.05.010(S)(2) (1992).

90. A.M.C. § 17.05.010(V)(1)–(3) (1992).

91. *Id.*