**UNDERWRITERS AT LLOYD'S LONDON, Appellant,**

v.

**THE NARROWS, L & L Enterprises, a partnership composed of Jeanne L. Lindley and Carson E. Lindley, d/b/a The Narrows, Jeanne L. Lindley, Carson E. Lindley, Appellees.**

Nos. S–4388, 4723.

Supreme Court of Alaska.

Jan. 29, 1993.

Rehearing Denied Feb. 23, 1993.

Leo W. Fraser, Mendes & Mount, New York City, Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, and Leroy J. Barker, Robertson, Monagle & Eastaugh, Anchorage, for appellant.

Murphy L. Clark, Clark, Walther & Flanigan, Anchorage, for appellees.

Before RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

### OPINION

BURKE, Justice.

### I. INTRODUCTION

The Narrows, a bar, restaurant and residence owned by Jeanne L. Lindley and Carson E. Lindley, was destroyed by fire in May 1989. After their proof of loss claim was rejected, the Lindleys (hereinafter "the

insured") sued Underwriters[1] alleging breach of contract and a "bad faith" refusal to pay on their claim.[2] In August 1990 Superior Court Judge Victor Carlson compelled Underwriters to produce, *inter alia,* its "bad faith" claims files and the financial statements of its members. He also ordered Underwriters to produce witnesses for depositions. In November the insured moved for sanctions, arguing that Underwriters failed to comply with the court's August order. Judge Carlson granted the insured's motion for sanctions and struck Underwriters' answer, resolving all liability in the insured's favor. A jury trial commenced to determine the amount of the insured's damages. In January 1991 the jury returned a verdict against Underwriters, awarding the insured $150,000 for loss of economic benefit, $1,000,000 for emotional distress, and $60,000,000 as punitive damages. Judge Carlson then awarded attorneys fees of $24,541,426. Underwriters appeals.

We vacate Judge Carlson's sanctions order and remand for trial on all liability issues.

## II. DISCUSSION

### A. STANDARD OF REVIEW.

■ If a party fails to obey a discovery order, a trial court may impose sanctions under Civil Rule 37(b).[3] We review such decisions for abuse of discretion. *Rohweder v. Fleetwood Homes of Oregon,* 767 P.2d 187, 190 (Alaska 1989).

### B. RELEVANT AUTHORITY.

The law on Rule 37 sanctions in Alaska is well settled. Issue establishment under Rule 37(b), that is, conclusively resolving an issue against a party who does not comply with discovery orders, is an "extreme sanction which should be used only in extreme cases." *Otis Elevator Co. v. Garber,* 820 P.2d 1072, 1074 (Alaska 1991). For this reason, the trial court must find that the non-complying party "willfully" violated the discovery order in question. *Alaska Trams Corp. v. Alaska Elec. Light & Power,* 743 P.2d 350, 354 (Alaska 1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). "Willfulness" is defined as the "conscious intent to impede discovery, and not mere delay, inability or good faith resistance." *Hawes Firearms Co. v. Edwards,* 634 P.2d 377, 378 (Alaska 1981). We have held that before a court may impose litigation ending sanctions for discovery violations the record must clearly indicate a reasonable exploration of possible and meaningful alternatives to dismissal. *Sandstrom & Sons, Inc. v. State,* 843 P.2d 645 (Alaska 1992). Finally, the sanction must be "sufficiently related" to the discovery violation. *Honda Motor Co. v. Salzman,* 751 P.2d 489, 493 (Alaska 1988).

---

**1.** "Underwriters" is short for Underwriters at Lloyd's, London, the defendant-appellant in this case. Underwriters is an "insurance market" comprised of approximately 26,000 "Names", or "Members", organized into about 400 syndicates. Thirty-two syndicates underwrote Lloyd's portion of the policy for The Narrows. The "lead syndicate" underwrote 13.1579% of Lloyd's share. This syndicate contained about 1500 Names. The 32 syndicates represent "thousands of individual Lloyd's members." Colin Benson was the lead syndicate's claims person. He made claims decisions for his syndicate based on advice he received from Underwriters' local attorney in Anchorage, Timothy Lynch. The decisions for the remaining syndicates were made by Lloyd's Underwriters Non-Marine Claims Office (LUNCO), which agreed with the decisions made by Benson.

**2.** The complaint also listed Gotham Insurance Co. and Lynch, Crosby and Sisson as defendants. Gotham and Underwriters were each contractually liable for 50% of a covered loss on the Narrows policy. Timothy Lynch, a partner in Lynch, Crosby and Sisson, handled the claims processing for the insurers. The trial judge's December 17, 1990 sanctions order against Underwriters (discussed *infra*) suspended litigation against Gotham and Lynch "pending the finalization of the Lloyd's litigation."

**3.** Alaska Civil Rule 37(b)(2) reads in part:

> If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> ....
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]

We must determine "if the established issue is an 'element of the dispute that cannot be determined on the merits without disclosure of the evidence the court has ordered the party to produce.'" *Id.* (quoting *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 460 (Alaska 1986)). For example, in *Honda Motor,* we affirmed a sanction conclusively establishing the defendant's liability because the trial court imposed sanctions only after Honda repeatedly refused to produce design defect documents in a products liability case. *Id.* We relied on the fact that without these documents the plaintiff could not "be expected to prove either the existence of a defect or causation." *Id.* (emphasis deleted). Thus, the sanctions were "closely tailored to Honda's misconduct." *Id.*

### C. THE SUPERIOR COURT ABUSED ITS DISCRETION WHEN IT DISMISSED UNDERWRITERS' ANSWER FOR ITS FAILURE TO COMPLY WITH THE AUGUST 13 DISCOVERY ORDER.

In his August 13 order, Judge Carlson reopened discovery to "pursue any issues relating" to a claims handling procedure manual that Underwriters had produced in June. He set October 19 as the closing date for this new round of discovery. He ordered Underwriters to produce witnesses in Anchorage. He also ordered Underwriters to complete its responses to the insured's November 1989 interrogatories by August 31.

Judge Carlson relied on three violations of his August 13 order to support his sanctions order:[4]

1. Lloyd's willfully refused to comply with the order of this court dated August 13, 1990, in refusing to produce all other claims files materials where bad faith claims ... had been asserted against Lloyd's....

2. Lloyd's willfully refused to comply with the order of this court dated August 13, 1990, in refusing to produce the financial statements and financial information of the members of the syndicates that participated in the insurance policy issued to the plaintiffs in this case....

3. Lloyd's willfully refused to produce witnesses for the depositions noticed by plaintiffs to resume on November 7, 1990.

After careful consideration, we conclude that Judge Carlson's findings are not supported by the record and therefore do not support the court's extreme sanction of establishing Underwriters' liability.

■ 1. *The "bad faith" claims files.* In November 1989 the insured requested that Underwriters produce, *inter alia,* "all claims files where it is claimed or alleged that [Underwriters] had acted in bad faith." On January 29, 1990, Lloyd's responded "None." It was not until November 16, 1990, nine months after Underwriters attested that no files existed, and two and a half months after the August 31 deadline identified in the August 13 order, that Underwriters produced 2,000 pages of "bad faith" files, consisting of complaints, answers and judgments from cases involving the 32 syndicates underwriting the policy.

We condemn Underwriters' failure to forthrightly answer the insured's initial request for the "bad faith" files. However, the appropriate focus for determining the propriety of the sanctions order is not Underwriters' response to the interrogatories, but its response to Judge Carlson's August 13 order.

The sanctions order is factually incorrect when it states that Lloyd's failed to produce "bad faith" claims files.[5] The properly presented issue is whether Underwriters' late production of only the complaints, answers and judgments of its "bad faith"

---

**4.** The sanctions order that Judge Carlson signed was submitted by the insured with their November 8, 1990 motion for sanctions. Judge Carlson made no changes to the seven page document.

**5.** This error resulted from Judge Carlson signing the insured's proposed order, which was filed on November 8, 1990. Underwriters produced the files on November 16, 1990.

files constitutes willful non-compliance with the August 13 discovery order.

The insured complained that the documents that were produced fell short of the court's order and were not detailed enough to support the insured's conspiracy theory. However, Judge Carlson never determined if Underwriters' response was adequate. Although the documents were available for the court's inspection, Judge Carlson issued his order without reviewing them.[6] Before adopting a sanction as drastic as issue establishment, the superior court must very carefully consider a party's alleged non-compliance with its order compelling discovery. *Honda Motor*, 751 P.2d at 493. Judge Carlson's failure to do so here constitutes an abuse of discretion.

Judge Carlson also abused his discretion by failing to explore the possibility of less drastic sanctions. The transcript of the sanctions hearing is completely void of any exploration of sanctions short of an issue establishment sanction which resulted in judgment on liability against Underwriters. The only indication in the order itself that the trial court conducted such an inquiry is this introductory paragraph: "The court has made every effort to tailor the sanctions being granted against the gravity of the discovery abuses and the violations of the orders of this court, and not as punishment or as a fine against Underwriters at Lloyd's London." Such conclusory language does not evidence the kind of "reasonable exploration" that we require. *See Otis Elevator*, 820 P.2d at 1074 ("The court's statement that Otis intentionally failed to make discovery from the outset of this litigation is too general to serve as a basis for affirming the order.").

■ 2. *The financial statements.* The insured's November 1989 discovery request asked for "current financial statements of all of the participants in the Underwriters at Lloyd's London portion of the insurance

coverage." When Underwriters did not comply, the insured moved to compel. At the August hearing on the matter, Underwriters complained of the undue burden of this request.[7] Judge Carlson asked if a discovery limit might be appropriate. He then suggested a few himself, such as limiting the production of financial statements to those with at least a "one percent" stake in the policy, or simply requiring Underwriters to disclose financial information of the "whole conglomeration, Lloyd's of London."

In response to this order, Underwriters produced copies of the Lloyd's Insurance Market's Global Reports for 1985–89, the latest individual financial statements for each of the 32 syndicates having an interest in the policy, and a list of each underwriter ("numbering in the tens of thousands"), listing the individual amount of premium income that could have been written for the Underwriter's account during 1989. Underwriters never produced the financial statements of the individual underwriters.

Based on the financial information Underwriters produced, it can not be said that Underwriters' actions evidence a "conscious intent to impede discovery." *Alaska Trams*, 743 P.2d at 354. When the August 13 order is read in conjunction with Judge Carlson's suggestions at the August 9 hearing, it is reasonable to conclude that Underwriters substantially complied with the order. Underwriters did, in fact, produce financial information for the "whole conglomeration" (i.e. Lloyd's) and for everyone with at least a "one-percent stake" in the policy (i.e. the 32 syndicates).

Furthermore, regardless of whether Underwriters complied with the order, a liability sanction for not producing the financial information was an abuse of discretion because the sanction does not satisfy the "substantial relation" test. *See Honda*

---

6. Judge Carlson concluded the sanctions hearing by stating only this: "The Motion for Granting of Sanctions is granted. I find that in fact the legal requirements to grant that motion have—are met. And therefore the order granting sanctions has been signed."

7. Underwriters notes that each individual underwriter's financial statement is from three to five pages long. It estimates that producing all of the individual statements would take 60,000 to 100,000 pages.

*Motor*, 751 P.2d at 493. For the sanction to be more than "mere punishment" the established issue must be an "element of the dispute that cannot be determined on the merits without disclosure of the evidence the court has ordered the party to produce." *Id.* Wealth was only relevant to punitive damages,[8] not liability on the contract and/or tort claims. The contract and tort claims could be resolved on the merits without the financial statements. Thus, Judge Carlson's order, which granted sanctions in part based on Underwriters' failure to produce certain financial statements, is "mere punishment" and must be vacated.

■ 3. *The November 7 depositions.* The third and final reason Judge Carlson gave for imposing sanctions was Underwriters' refusal to resume depositions on November 7. Judge Carlson's August 13 order stated that discovery would close on October 19. On August 21 the insured provided Underwriters with notice that it had scheduled a series of depositions which would last five weeks. The depositions began as scheduled on September 17, 1990. After seven consecutive days of testimony, the depositions were suspended so that Underwriters' New York counsel could fly to London to gather more information (specifically, the "bad faith" files). On September 21 (two days before counsel's departure) both sides agreed to continue the depositions until October 1 or 2. On September 23, at the completion of the first round of depositions, after Underwriters' counsel was set to fly to London, the insured's counsel changed his mind and said that he was ready to recommence depositions on September 27. Underwriters' counsel nevertheless flew to London as planned.

On September 27 we granted Underwriters' motion for a stay in discovery pending consideration of defendant's petition for review of the August 13 order.[9] The petition was eventually denied, and the stay lifted

on October 22, three days after Judge Carlson originally ordered discovery to close.

On October 25 the insured noticed a resumption of depositions to begin on November 7. Underwriters refused to produce witnesses and on October 31 moved instead for a status conference. The insured moved for sanctions on November 8. Judge Carlson did not deny Underwriters' motion for a status conference until November 11, four days after the depositions were scheduled to begin. Judge Carlson's denial of the status conference request makes no mention of the proposed resumption of depositions, and does not address Underwriters' theory that the deadline for closing discovery expired while this court was considering its petition for review. The insured did not move to resume the depositions after November 11. Attention thereafter was directed toward the sanctions motion.

Underwriters now argues, in effect, that it cannot be sanctioned for simply following orders. That is, its refusal to conduct depositions between September 27 and October 22 was reasonably based on our stay of discovery, and its refusal to resume depositions on November 7 was reasonably based on the passing of Judge Carlson's original October 19 discovery deadline. It is axiomatic that for Rule 37 sanctions to be appropriate, a party must willfully fail to comply with an existing order. While Underwriters was, of course, free to resume the depositions on November 7, to require Underwriters' attendance (and to sanction it for not attending) would have taken another order extending the discovery deadline.

This case presents unusual facts, since half the time allotted for discovery under the August 13 order was filled by our discovery stay. We are wary of allowing Underwriters to use this procedural peculiarity to escape its obligations under the order to compel. Still, we are also cogni-

---

8. At trial, the insured's experts used information obtained in discovery to calculate the income of all the Underwriters, the assets of all the "Names", the wealth of the 32 syndicates behind the policy, and the wealth of all the members of these 32 syndicates. The jury apparently used

this information to return a $60 million punitive damages award.

9. The petition was filed on September 13; the stay was formalized on October 9.

zant of the requirement that a party's non-compliance with an order be "willful" before issue establishment sanctions are appropriate. *Hawes Firearms,* 634 P.2d at 378. By requesting a status conference, Underwriters evidenced a good faith concern about the continued viability of the order requiring production of witnesses. It would have been helpful if the trial court had indeed scheduled the status conference. Judge Carlson could then have issued a second order reopening discovery. Without such an order, we cannot say that Underwriters' refusal to produce witnesses on November 7 amounts to willful non-compliance with an existing order.[10]

By vacating the sanctions order, we do not suggest nor do we believe that Underwriters is free from blame. On remand, it would be entirely appropriate to order Underwriters to pay all costs associated with its failure to answer the interrogatories honestly, and with its delay in producing relevant documents.

The superior court's sanctions order is VACATED, and its partial judgment is REVERSED. The case is REMANDED for further proceedings.[11]

MOORE, C.J., not participating.

---

**10.** One other aspect of the sanctions order merits brief attention. In Paragraph 12, Judge Carlson found that "defendants were without justification or reason in failing to pay or tender the full policy limits to plaintiffs within 60 days after July 14, 1990." (The date should read 1989.) The order includes no facts supporting this conclusion. The statement amounts to a conclusion that no genuine issues of material fact exist on the issue, although Judge Carlson had twice before denied the insureds' summary judgment motions on this very point. The insureds had not renewed their summary judg-ment motion and the issue was not before the court at the December 17 hearing. The court's conclusion was therefore procedurally inappropriate. *See* Alaska Civil Rule 56.

**11.** Because of our holding today, the jury's award and Judge Carlson's attorney's fee award are necessarily vacated. Our vacation of the issue establishment sanction has made it unnecessary to address any of the remaining issues raised in this appeal.