WHITE MOUNTAIN MINING PART-
NERS, an Alaska Limited Partnership,
and Wayne Bolt, Appellants,

v.

PTARMIGAN COMPANY, INC., Appellee.

NABESNA MINING PARTNERS, an
Alaska Limited Partnership,
Appellant,

v.

PTARMIGAN COMPANY, INC., Appellee.

Nos. S–5743, S–5744.

Supreme Court of Alaska.

Nov. 24, 1995.

Rehearing Denied Dec. 28, 1995.

J. Jeffrey Mayhook, Law Offices of J. Jeffrey Mayhook, Anchorage, for appellant White Mountain Mining Partners.

Wayne Bolt, pro se, Anchorage.

Kirsten Tinglum, Ashburn & Mason, P.C., Anchorage, for appellee Ptarmigan Company, Inc.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MATTHEWS, Justice.

The main issues in these cases are whether the trial court erred in entering issue-preclusion sanctions and, in a subsequent order, litigation-ending sanctions. We affirm the order of issue preclusion, vacate the order ending the litigation, remand to the trial court for additional findings and a decision in light of those findings, and retain jurisdiction pending the trial court's decision.

## I. FACTS AND PROCEEDINGS

Ptarmigan Company, Inc. (Ptarmigan), is the owner of two groups of mining claims located within the Wrangell–St. Elias National Park and Preserve. The first group, the White Mountain claims, are patented. The second group, the Rambler claims, are unpatented. On July 1, 1983, Ptarmigan granted to Wayne Bolt (Bolt) the mining rights in the Rambler claims in exchange for minimum royalty payments of $1500 per month to begin June 1, 1984, and increasing over time. The grant also provided for production royalties. Bolt was required to perform annual assessment work and do a minimum amount of drilling in the first two years of the grant. The grant contained a force majeure clause, excusing performance of the grant under certain circumstances. The term was ten years, subject to extension year by year by commercial production so long as minimum royalties were paid.

On July 2, 1984, Ptarmigan granted mining rights to Bolt in its White Mountain claims. Bolt was to pay Ptarmigan a minimum royalty which increased to $5000 per month as of June 1, 1988. In addition, a production royalty was to be paid to the extent that the production royalty due exceeded the minimum royalty. The term of the agreement was fifteen years subject to extension year by year by commercial production so long as minimum royalties were paid. This agreement also had a force majeure clause.

By mutual agreement the parties amended the Rambler grant on July 2, 1984. Under the amendment, Bolt's obligations under the grant were suspended due to action by the Bureau of Land Management declaring that the Rambler claims were void. Bolt's obligations were to resume if and when Ptarmigan was able to establish its right, title and interest to the Rambler claims. If the Rambler claims were lost Bolt was to be allowed certain credits on the White Mountain claims. These were confusingly described in the amendment as "not to exceed fifty thousand dollars ($50,000) and up to the four hundred twenty-five thousand dollars ($425,000) Wayne Bolt expended on the Rambler claims during 1983."

Bolt assigned the Rambler grant to Nabesna Mining Partners (NMP), an Alaska limited partnership of which Bolt is the general partner. Bolt assigned the White Mountain grant to White Mountain Mining Partners (WMMP), another Alaska limited partnership of which Bolt was also general partner.

In March of 1986, WMMP granted Colorado Resources, Inc. (CRI), a publicly traded Washington corporation, an option on the White Mountain claims in exchange for cash and CRI stock. Bolt became a CRI director in 1987 and president of the company in 1988. CRI began negotiating with Newmont Mining Corporation, a large international gold producer. On September 27, 1988, NMP assigned the Rambler claim grant to CRI in exchange for CRI stock and a $50,000 demand note. On the same day, WMMP assigned the White Mountain grant to CRI pursuant to the previously granted option in

exchange for additional CRI stock and a demand note for $50,000. Both notes from CRI contained strict forfeiture clauses purporting to give the payees the right to nullify the assignments on nonpayment. A month later, CRI assigned both grants to Newmont. The agreement with Newmont recites that Newmont paid $110,000 to CRI on execution of the agreement and contains a promise to pay a $75,000 annual royalty on the first day of May of 1989, 1990, and 1991. Thereafter the annual royalty was to increase. A production royalty was also provided for.

At some point a derivative suit on behalf of certain shareholders of CRI was filed against Bolt. On May 10, 1989, WMMP and NMP executed and later recorded documents purporting to cancel for nonpayment the assignments of the White Mountain and Rambler grants to CRI. On May 30, 1989, Newmont terminated its agreement with CRI under which Newmont had been granted the White Mountain and Rambler claims. In a letter of that date Newmont asked CRI whether "it wish[ed] to receive an assignment of the Underlying Agreements and Properties." On July 7, 1989, Newmont forwarded an executed reassignment to CRI. On August 30, 1989, Newmont wrote to Ptarmigan, stating that Newmont interpreted inaction by CRI as an election not to accept reassignment of the claims. Newmont expressed its desire to terminate its interests in the grants. On September 21, 1989, Newmont quit-claimed its interest in the grants to Ptarmigan and paid Ptarmigan $5000 as the "final $5000 payment due under the captioned Grants."

Until September of 1989 the $5000 monthly royalty due Ptarmigan under the original White Mountain grant was regularly paid. The payment of the Rambler grant was excused. On September 1, 1989, Bolt, on behalf of WMMP, invoked the force majeure clause of the original White Mountain grant, stating that "[m]onthly payments are now in abeyance" because of an injunction prohibiting mining in certain national parks. Bolt promised to use his best efforts to gain approval from the court for a plan of operation which would lift the injunction as to the White Mountain claims. On September 11, 1989, CRI filed a petition in bankruptcy under Chapter 7 of the Bankruptcy Act. On September 17, 1990, the trustee for CRI quit-claimed CRI's interest in the mining claims to Ptarmigan in exchange for $3500.

On October 31, 1990, Ptarmigan sued Bolt, WMMP and NMP in the superior court. Ptarmigan's suit contains three counts. The first count alleges that Ptarmigan owns the claims by virtue of its original ownership and the quit-claim deeds from CRI and Newmont, and that WMMP's, NMP's, and Bolt's claims by virtue of the May 1989 cancellations "are without right." In the second count, Ptarmigan claims that the cancellations were made "with an intent to defraud CRI of the White Mountain and Rambler mining claims and to hinder and cloud Ptarmigan's rights to the Rambler and White Mountain mining claims," and are therefore void under AS 34.40.010.[1] The third count claimed that Bolt was in breach of his contract with Ptarmigan in two respects: (1) by failing to pay the $5000 monthly royalty since September of 1989, and (2) by assigning the White Mountain and Rambler claims to CRI and permitting CRI to assign the claims to Newmont.

Ptarmigan requested the following relief: (1) that the May 1989 cancellations be voided and removed from the chain of title to the White Mountain and Rambler claims; (2) that Bolt pay damages for the missed royalty payments from "October 1989 to September 1990," plus interest; and (3) in the alternative, that the original grant of mining rights to Bolt be terminated for breach of contract

---

1. The complaint cites AS 34.40.810. This is an evident typographical error as such a section does not exist. Alaska Statute 34.40.010 provides:

   A conveyance or assignment, in writing or otherwise, of an estate or interest in land, or in goods, or things in action, or of rents or profits issuing from them or a charge upon land, goods, or things in action, or upon the rents or profits from them, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, or a bond or other evidence of debt given, action commenced, decree or judgment suffered, with the like intent, as against the persons so hindered, delayed, or defrauded is void.

and that Bolt be required to pay damages in the amount of the missed royalty payments from October 1989 to the date of termination. In addition Ptarmigan requested interest, costs and attorney's fees.

Bolt answered the complaint, asserted a number of affirmative defenses including waiver, estoppel and ratification, asked for an affirmative ruling from the court that Ptarmigan's "only interest in the White Mountain and Rambler claims is as owner and lessor of such claims," and demanded a jury trial.

On March 4, 1991, Ptarmigan propounded comprehensive interrogatories and requests for production. On July 3, 1991, Ptarmigan moved for an order compelling responses to the requests for production and to certain of the interrogatories. In addition Ptarmigan sought an order compelling compliance with Alaska Civil Rule 16.1(k).[2] The motion was opposed on the grounds that Bolt had complied with discovery, had "provided thousands of pages of responsive documents, and ... answered interrogatories and requests to admit [and] timely objected to the remainder of the requests to produce interrogatories and requests to admit." Bolt also responded to the motion to compel compliance with Civil Rule 16.1(k), generally noting that his response to the motion to compel covered the items required to be produced under 16.1(k) and that the other items mentioned in the rule were inapplicable except for insurance documents, as to which Bolt opined that there was no "need for a court order to have those produced." On October 19, 1991, the superior court entered an order compelling discovery, requiring the defendants to answer certain of the interrogatories, and to respond to most of the requests for production within thirty days.

The defendants responded to the requests for production on November 18, 1991. In general, the responses identified where the documents could be inspected, identified the documents as voluminous, and asked for prior notice as to when inspection would take place. However, concerning the requests for the personal federal income tax returns for Wayne Bolt and Ann Bolt for 1986 through 1990, the defendants' response was different. The response opened by pointing out that Ptarmigan had refused to produce copies of its tax returns in response to a request for production by defendants on the ground of relevance, and invited Ptarmigan to limit its discovery requests reciprocally. Next the response asked Ptarmigan to explain why the returns were relevant and then turned to an examination of case law recognizing a taxpayer's privacy interest in the taxpayer's income tax return. Finally, the defendants concluded by stating that if Ptarmigan continued to insist on production of the tax returns, Bolt would produce the returns in court for in-camera review. The concluding paragraphs of the response to the requests for production read as follows:

Defendants conclude by reiterating their desire and intent to comply with the court's order and with all reasonable discovery requests in a manner and with reasonable procedures which they believe will carry out the intention of the court.

Finally, to the extent that [Ptarmigan] continues to insist on production of the tax returns, defendant Bolt will comply with the court order, and make production, but to the court for in camera review and inspection, together with an appropriate motion and order limiting discovery and misuse of defendant Bolt's federal income tax return information.

On November 27, 1991, Ptarmigan moved for sanctions for "willful failure" to produce income tax returns. The sanction sought was establishment as a fact that the May 1989 cancellations of the lease assignments were fraudulent. A few days later counsel for Ptarmigan filed an affidavit which stated that she and counsel for Bolt had arranged that on December 4, 1991, she would be allowed to inspect eight boxes of documents belonging to the defendants. She related that on the day before the event counsel for Bolt reported to her that Bolt had without explanation demanded that the eight boxes be

---

**2.** Civil Rule 16.1(k) requires each party without formal request or motion to furnish to other parties certain specified documents germane to the case, including "all relevant contracts and all written and recorded communications, memoranda, and notes which contain evidence relevant to the interpretation of such contracts and any claimed breaches thereof."

returned to him and that Bolt's counsel complied with this request.

While the motion for sanctions was pending, Ptarmigan moved to have the case set for trial, stating that, "[w]ith the court's assistance in enforcing discovery through sanctions, all meaningful discovery can be completed in the next 60 days." Bolt's counsel obtained an extension of time in which to respond to the motion for sanctions. On January 6, 1992, the defendants responded to the motion, again arguing that the Bolts' tax returns were irrelevant and that Ptarmigan had refused to produce its tax returns. Concerning relevance, the defendants argued that Ptarmigan was not truly sincere about obtaining information from them and was only interested in obtaining sanctions. The defendants argued that if Ptarmigan were interested in obtaining information, it would depose Bolt. The defendants concluded:

> The court should deny the motion for sanctions and issue a protective order against disclosure of tax returns, unless and until Ptarmigan, after deposing Mr. Bolt, can make a strong showing of relevance and need, and can justify a sufficiently narrow breach of the normal rules of confidentiality which govern tax returns, tailored to the circumstances of this case.

Along with their opposition to the motion for sanctions, the defendants moved for a protective order "preventing, limiting, or conditioning [Ptarmigan's] right to inspect personal income tax returns of Ann Bolt and Wayne Bolt," supported by essentially the same grounds as their opposition to the motion for sanctions.

Ptarmigan's counsel then sought to arrange Bolt's deposition and noticed it for February 11, 1992. The deposition did not take place, however, as Bolt's counsel was initially unable to reach Bolt and eventually received a letter from Bolt stating that he refused to be deposed.

On February 13, 1992, before the motion for sanctions was ruled on, the trial court issued a pretrial order setting the case for trial on May 11, 1992. Also while the motion

for sanctions was pending Ptarmigan filed a second motion for sanctions on February 20, 1992. The second motion asked that the court enter a default judgment against the defendants for their refusal to comply with the court's October 1991 discovery order.

On February 21, 1992, Judge Woodward denied the defendants' motion for protective order and granted, in part, the first motion for sanctions. The order required production of the requested income tax returns within fifteen days and payment of $400 "or the requested issue preclusion order will be entered." [3] The fifteen-day deadline established by the trial court's order of February 21, 1992, passed without production of the requested income tax returns. Accordingly, on March 31, 1992, Judge Woodward granted Ptarmigan's first motion for sanctions and entered an order establishing that the May 1989 cancellations were fraudulent. The order states:

> 1) Bolt had refused to comply with the court's order compelling discovery; 2) that Bolt's noncompliance was willful and in bad faith; 3) that the fact sought to be established was relevant to the information willfully withheld; and 4) that Ptarmigan made a clear showing that the establishment of the fact was required under the circumstances of the case.

On April 13, 1992, defendants responded to the second motion for sanctions. Defendants argued that they had provided much information to Ptarmigan in response to Ptarmigan's discovery requests and that Ptarmigan had made no showing as to how the nonproduction of any particular document had any relevance to it claims. Defendants also argued that plaintiff had moved for summary judgment and for trial and that both motions were inconsistent with any assertion that plaintiff needed hundreds of thousands of additional documents in order to prepare for trial. Defendants' counsel also offered the deposition of Bolt, stating that Bolt "now advises that ... he would readily participate," and asked for an evidentiary hearing

---

**3.** Judge Woodward also observed "[d]efendants are not entitled to wait until *after* a motion to compel has been *granted* to brief for the first time their arguments in support of their specific objections to discovery which has been compelled."

so that Bolt could testify and full consideration of all the relevant factors could be assured.

On April 21, the defendants moved to remove the case from the trial calendar. This motion was opposed by Ptarmigan.

On April 27, 1992, the trial court scheduled an evidentiary hearing on Ptarmigan's second motion for sanctions for May 1, 1992. The court ordered Bolt "to bring with him to the hearing every single document previously ordered to be produced. The court can envision no excuse in this regard that will be tolerated."

At the May 1 hearing, Bolt appeared with counsel and seven cartons of records. Counsel represented that the cartons contained about 16,000 pages of documents and that another seven cartons of records, containing another 15,000 pages, were in counsel's office in the process of being copied. The records did not include the defendants' tax returns which had been requested, though Bolt stated that he had brought some of the tax returns with him.

At the conclusion of the hearing, the trial court granted the second motion for sanctions and ordered the default of the defendants. The court found that Bolt's conduct "exhibited willfulness beyond any doubt." The court did not find that there were documents which had not been produced which were relevant to the case in its post-preclusion-order context. Instead, the court found that in order for appellee's counsel to understand the documents that had been, or were in the process of being, produced, a continuance of the upcoming trial date would be necessary. The court stated:

> In this case, there appears at this juncture to be no remedy short of default that fits the conduct engaged in by Mr. Bolt. Ms. Tinglum [Ptarmigan's counsel] initially

suggested at least one other option, [prohibiting Bolt from testifying at trial,] a very dire sanction. And she was forced to back down on that when it became evident that to be safe from her perspective she would have to have access to the documents; have to have an opportunity to examine them; and that inevitably that would require a substantial delay of the trial.

> This after all [is] what Mr. Bolt wanted. To do other than grant the default in this instance would be to give the defendants in this case precisely what they were hoping to achieve by their dilatory tactics. And I decline to make such a mockery of the court system and of our discovery orders, as that would accomplish.

The court thereupon entered an order of default on the second motion for sanctions and a final order and judgment quieting title to the Rambler and White Mountain claims in favor of Ptarmigan.

Appellants challenge the preclusion order and the order of default on the grounds that the personal tax returns of the Bolts were not relevant, Bolt's noncompliance was not willful, the noncompliance did not materially hamper or prejudice Ptarmigan's case, the sanctions did not directly relate to the violations, and the court did not adequately consider lesser sanctions.

## II. *DISCUSSION*

■ In determining whether a trial court abused its discretion in entering issue-establishment or litigation-ending sanctions, a three-step analysis is used. There must be (1) a finding of willfulness; (2) a record that indicates a reasonable exploration of possible and meaningful alternatives; and (3) a sufficient relationship between the discovery materials and the case.[4]

---

4. In *Underwriters at Lloyd's London v. The Narrows*, 846 P.2d 118, 119–20 (Alaska 1993), we stated:

> The law on Rule 37 sanctions in Alaska is well settled. Issue establishment under Rule 37(b), that is, conclusively resolving an issue against a party who does not comply with discovery orders, is an "extreme sanction which should be used only in extreme cases." *Otis Elevator Co. v. Garber*, 820 P.2d 1072,

1074 (Alaska 1991). For this reason, the trial court must find that the non-complying party "willfully" violated the discovery order in question. *Alaska Trams Corp. v. Alaska Elec. Light & Power*, 743 P.2d 350, 354 (Alaska 1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). "Willfulness" is defined as the "conscious intent to impede discovery, and not mere delay, inability or good faith resistance." *Hawes Firearms Co. v.*

## A. First Sanction

■ Concerning the first sanction of issue establishment, there is ample evidence supporting the superior court's finding that Bolt's noncompliance was willful. Prior to entry of the March 31 establishment order, two discovery orders were entered, one on October 19, 1991, and the second on February 21, 1992, neither of which Bolt obeyed. The second order gave Bolt fifteen days to produce the tax returns and to pay Ptarmigan $400 as a monetary sanction, or suffer the entry of the establishment order. Bolt still refused to turn over any of the tax returns or pay monetary sanctions to Ptarmigan. Thus, despite two orders, two separate deadlines, and one specific warning that the requested sanction would be imposed, Bolt failed to produce any tax returns.

The record in this case also reflects that the superior court considered possible and meaningful alternatives to the issue-establishment sanctions. Prior to the March 31 Establishment Order, the court not only considered, but actually tried imposing the lesser alternative of a monetary fine. Its February 21 order required Bolt to pay $400 and produce the tax returns compelled by the October 19 order within fifteen days. Bolt failed to pay the monetary sanction and produce the tax returns by the new deadline.

Concerning the third step in the analysis, that of relevance, the issue of wrongful cancellation appears to be sufficiently related to the discovery request. In describing the relevance of the tax returns, Ptarmigan stated:

> [t]hese documents [the 1986–1990 tax returns of Wayne and Ann Bolt and Bolt's company, Alaska Drilling] are critical to *Ptarmigan's theory that the May, 1989 cancellations were a fraud* as they may evidence that while he controlled WMMP, NMP, Alaska Drilling and Colorado Resources, Inc. ("CRI"), Bolt was lining his

own pockets (often through Alaska Drilling) with CRI funds while portraying to the world and CRI shareholders that CRI could not afford the $50,000 required to avoid the cancellation.

(Emphasis added.) The income tax returns sought by Ptarmigan were thus potentially relevant to the question of whether the notes due from CRI to the partnerships had been paid. Accordingly, the superior court was correct in ruling that the tax returns were sufficiently related to the issue of wrongful cancellation to justify the first sanction imposed.

## B. Second Sanction

■ As noted, Bolt's counsel brought seven cartons of records to the May 1 hearing. He stated that these cartons contained about 16,000 documents and that another seven cartons containing about 15,000 documents were in his office and were then being copied for production. He stated that his office could only copy about 10,000 documents per day, and that the documents would be given to plaintiff's counsel when copying was completed. The failure to bring all fourteen cartons to the May 1 hearing violated the court's April 27, 1992 order. However, no grounds exist for questioning the good faith of Bolt's counsel in deciding to continue copying the remaining seven cartons of documents so that copies could be furnished to plaintiff's counsel on the following day rather than to bring them to court. In arguing for the second sanction, plaintiff's counsel did not claim that she had been prejudiced by the non-production of all fourteen cartons on May 1. Instead, she argued that her problem was that too many documents had been produced for her to meaningfully deal with, given the fact that the trial was only ten days off. In making this argument she assumed that all of the documents in the fourteen cartons had been produced: "They waited

*Edwards*, 634 P.2d 377, 378 (Alaska 1981). We have held that before a court may impose litigation ending sanctions for discovery violations the record must clearly indicate a reasonable exploration of possible and meaningful alternatives to dismissal. *Sandstrom & Sons, Inc. v. State*, 843 P.2d 645 (Alaska 1992). Finally, the sanction must be "sufficiently related" to the discovery violation. *Honda Motor*

*Co. v. Salzman*, 751 P.2d 489, 493 (Alaska 1988). We must determine "if the established issue is an 'element of the dispute that cannot be determined on the merits without disclosure of the evidence the court has ordered the party to produce.' " *Id.* (quoting *Hazen v. Municipality of Anchorage*, 718 P.2d 456, 460 (Alaska 1986)).

until ten days before trial to produce 30,000 documents and argue with a straight face that we should be prepared to go forward on the 11th after deposing Mr. Bolt next week. It is an impossible task." Because of the good faith of Bolt's counsel and the lack of prejudice to Ptarmigan, the decision of Bolt's counsel to continue copying the documents in the remaining seven cartons rather than bring them to court on May 1 is not a violation which would support serious sanctions. To the extent that the court relied on this violation in entering the order of default the court erred.

■ However, the fact remains that the documents in the fourteen cartons should have been timely produced in response to the court's order of October 19, 1991. The trial court's finding of willful noncompliance, insofar as it pertains to these documents and the October 19, 1991 order, is supported by the evidence. The same is true with respect to the tax returns which were never produced.

The superior court did not make findings concerning the existence of a relationship between the issues remaining to be tried and the untimely produced documents or the unproduced tax returns. It follows that the court also made no findings as to whether there was a sufficient relationship between the documents and the issues which remained in the case to warrant litigation-ending sanctions.[5] Once the court had established the issue of fraudulent conveyances in the first sanction, the relevance and importance of the documents may reasonably be questioned.

After the issue establishment order was entered, the issues remaining to be litigated were those in the third count of Ptarmigan's complaint: that Bolt was in breach of his contract with Ptarmigan (1) by failing to make the $5,000 monthly royalty payments on the White Mountain claims, and (2) by assigning the claims to other entities without Ptarmigan's permission. Bolt's defense to the first issue doubtless includes the force majeure clause based on his claim that an injunction prohibited mining. *See supra,*

page 1359. His defense to the second claim probably will include a claim of ratification based on the fact that Ptarmigan accepted payments from the assignees. The trial as so framed does not appear to be a complex one which requires numerous documents. However, it is possible that the withheld documents are sufficiently related to the issues remaining to be litigated to justify the second sanction.

Because of the lack of findings by the superior court concerning a sufficient relationship between the discovery violation and the issues which remained for trial after the first sanction was entered, we are remanding this case for entry of specific findings on this subject. Based on these findings, the superior court should re-examine whether the sanction of default was appropriate.

We will retain jurisdiction pending receipt of the superior court's findings and decision. The other issues raised by Bolt on appeal will be held in abeyance.

### III. CONCLUSION

The superior court's sanction of issue establishment against Bolt is AFFIRMED. The court's sanction of default judgment is VACATED; we REMAND for entry of findings of fact concerning the sufficiency of the relationship between the late produced documents and the withheld tax returns and the issues which remain in the case, and for the trial court's determination as to whether in light of those findings the default sanction was warranted. Jurisdiction is retained.

■■■■■■■■■

---

5. In *Alaska Trams Corp. v. Alaska Electric Light & Power,* 743 P.2d 350, 354–55 (Alaska 1987), we spoke of the need that the withheld materials be "substantial, as opposed to incidental, with respect to the issues in the case."