Takehiro **HIKITA** and Alaska Foods, Inc., Appellants,

v.

**NICHIRO GYOGYO KAISHA, LTD.,** Nichiro Pacific, Ltd., Appellees.

No. S–8121.

Supreme Court of Alaska.

Nov. 17, 2000.

Rehearing Denied Jan. 18, 2001.

---

**28.** *Id.*

Douglas C. Perkins, Hartig, Rhodes, Norman, Mahoney & Edwards, P.C., Anchorage, for Appellants.

John S. Hedland, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

PER CURIAM.

### I. INTRODUCTION

This is the third time this case has come before us,[1] and the sixth time we have addressed aspects of the underlying dispute.[2] The case involves two Japanese/American corporate fishing families, Alaska Foods, Inc. (Alaska Foods) and Nichiro Gyogyo Kaisha, Ltd. (Nichiro). In 1975 Nichiro physically and financially abandoned Adak Aleutian Processors, Inc. (Adak), a crab processing plant in Adak that Nichiro and Alaska Foods had created as a joint venture and of which each owned a thirty-percent share. Alaska Foods claims that Nichiro breached its contractual duties under their shareholders agreement. Nichiro denies this, and contends that a 1976 judgment in Nichiro's favor against Adak precludes Alaska Foods from relitigating the issue of Nichiro's alleged breach.

The last time this case was before us, in our 1989 decision in *Alaska Foods v. Nichiro Gyogyo Kaisha, Ltd.*, we remanded and instructed the superior court to determine whether the 1976 judgment precluded Alaska Foods's suit.[3] In 1990 the superior court summarily dismissed the suit on three grounds: as a sanction for discovery violations on remand, on the ground of issue

---

1. *See Alaska Foods, Inc. v. Nichiro Gyogyo Kaisha, Ltd.*, 768 P.2d 117 (Alaska 1989); *Hikita v. Nichiro Gyogyo Kaisha, Ltd.*, 713 P.2d 1197 (Alaska 1986).

2. *See Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 761 P.2d 713 (Alaska 1988); *Norman v. Nichiro Gyo-* *gyo Kaisha, Ltd.*, 645 P.2d 191 (Alaska 1982); *Nichiro Gyogyo Kaisha, Ltd. v. Norman*, 606 P.2d 401 (Alaska 1980).

3. *See Alaska Foods*, 768 P.2d at 119, 123–24.

preclusion, and on the merits. Alaska Foods appeals.

Because litigation-ending discovery sanctions are only permitted after the trial court explores alternative lesser sanctions and because the superior court did not explicitly discuss such alternatives, we conclude that dismissal as a discovery sanction was inappropriate. We further conclude dismissal on the ground of issue preclusion is not justified, because Alaska Foods lacked adequate incentive during the 1976 suit to litigate Nichiro's breach of the shareholders agreement. And on the merits, we find that Alaska Foods raised a genuine issue of material fact as to whether Nichiro breached the shareholders agreement by failing to use its best efforts to support the joint venture. Accordingly, we reverse the dismissal and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

In *Alaska Foods*, we set out the facts and proceedings:

In 1972 Isaac Norman entered into a five-year, $1000 per year lease with the U.S. Navy for some property on Finger Bay at Adak, Alaska. Norman intended to establish a land-based fish processing facility. To carry out his intentions, he formed Adak Aleutian Processors, Inc. [Adak], an Alaskan corporation, and transferred to it the Finger Bay lease.

Norman sold 30% of the [Adak] stock to Alaska Foods, 30% to [Nichiro], and 10% to Market Place. Alaska Foods, a Washington corporation, was controlled by Alaska Shokai, a Japanese corporation. Appellant Takehiro Hikita and his family owned more than 90% of Alaska Shokai. [Nichiro] is a Japanese corporation and Market Place is a Hawaiian corporation. The three corporations, all of [which] were engaged in various aspects of the fishing industry, agreed to pay Norman $200,000 jointly and severally for the stock purchased.

At the time of the stock purchase the parties also entered into a "shareholders agreement" which set out the general plan of operation and administration of [Adak].

The shareholders collectively agreed to "exert their best efforts to achieve the corporate and business purposes of [Adak]." In addition, each of the shareholders, with the exception of Norman, incurred various specific obligations pursuant to the agreement. [Nichiro] agreed to furnish to [Adak] sufficient funds for the construction and installation of new improvements, equipment and facilities for the Adak operations, upon terms and conditions to be agreed upon between [Nichiro] and [Adak]; to provide to [Adak] up to $2 million in working capital; and to provide technical assistance for the construction and operation of the processing facilities.

Alaska Foods also agreed to furnish funds sufficient for the construction of the necessary facilities, upon terms to be agreed upon between Alaska Foods and [Adak]. It further agreed to provide the necessary personnel to undertake the general affairs and business operations of [Adak]. In accordance with the first obligation, Alaska Foods advanced approximately $1.6 million to [Adak].

Under [Nichiro]'s supervision, the plant was completed in 1973 at a cost of $3.2 million, which was $2.5 million above the original estimate. Operations began during the 1973–74 fishing season. The plant was not productive for long, however, as several days into the 1974–75 season [Nichiro] suddenly and without notice withdrew from the venture. The facility never reopened.

[Nichiro]'s abandonment of the Adak Aleutian venture spawned at least five lawsuits. Three of them involved Adak Aleutian as a party, and two of them—the instant case and *Norman*—were brought by Adak Aleutian shareholders. *Norman* is not directly relevant to the instant case, but each of the Adak Aleutian cases is important and is therefore summarized below.

On August 15, 1975, the Bank of California filed a complaint in federal district court against Adak Aleutian and Nichiro Pacific[4] to foreclose on loans it had made

---

4. Nichiro Pacific was an American corporation and a subsidiary of Nichiro Gyogyo. *See Alaska Foods*, 768 P.2d at 118 n. 1. For purposes of this litigation, the parties treat Nichiro Pacific as an alter ego of Nichiro Gyogyo. Accordingly, we refer to them collectively as "Nichiro."

to Adak Aleutian. *Bank of California v. Adak Aleutian Processors, Inc.*, No. A75–182 Civ. (D.Alaska). Adak Aleutian cross-claimed against Nichiro Pacific, alleging that Nichiro Pacific had breached a fiduciary duty, converted assets, and breached an obligation to contribute working capital to Adak Aleutian. Adak Aleutian defaulted on the cross-claim on August 5, 1976, and the parties stipulated to a judgment of foreclosure the next day. The court entered a default judgment and decree of foreclosure on November 1, 1976. The cause of the default was Adak Aleutian's failure to provide adequate answers to interrogatories.

On June 4, 1975, Nichiro Pacific filed a complaint in superior court against Adak Aleutian for amounts owed on various promissory notes. *Nichiro Pacific, Ltd. v. Adak Aleutian Processors, Inc.*, No. 75–4074 Ci. (Alaska Super., 3d Dist., Anchorage). Adak Aleutian filed a third-party complaint against Nichiro Gyogyo and a counterclaim against Nichiro Pacific. The third-party complaint and the counterclaim made similar allegations of mismanagement, abuse, and refusal to advance funds. The superior court entered summary judgment in favor of Nichiro Pacific on its complaint in July 1976. Adak Aleutian's counterclaim and third-party complaint languished until December 1979, when the superior court granted summary judgment in favor of Nichiro Gyogyo and Nichiro Pacific. Invoking res judicata, the court implicitly ruled that the judgment in *Bank of California v. Adak Aleutian* barred Adak Aleutian's claims.

On July 9, 1975, Adak Aleutian filed a complaint in federal district court against Nichiro Gyogyo and Nichiro Pacific. *Adak Aleutian Processors, Inc. v. Nichiro Gyogyo Kaisha, Ltd.*, No. A75–153 Civ. (D.Alaska). This complaint alleged mismanagement and various breaches of obligations, similar to the allegations Adak Aleutian had made in the two previous suits. This case saw little activity, and the parties stipulated to a dismissal on May 3, 1976. Although the record does not explicitly reveal the reason for the stipulation, the timing and context strongly suggest that Adak Aleutian simply intended to pursue its claims in the other two cases.

Finally, Hikita and Alaska Foods initiated the instant litigation in superior court on October 21, 1977. In *Hikita*, we summarized the actions of the superior court as follows:

Alaska Foods asserted both contract and tort claims. Alaska Foods'[s] contract claims were dismissed for two reasons: First, the superior court held that *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 645 P.2d 191 (Alaska 1982) barred the contract action. Second, the superior court held that prior litigation between related parties barred the contract action under Restatement (Second) of Judgments § 56 (1980). Alaska Foods also asserted tort claims which were dismissed because of the bar of the two year statute of limitations.

Hikita, individually, asserted both contract and tort claims. Hikita's contract claims were dismissed because he was neither a party to, nor an intended beneficiary of, the shareholders agreement. Relying upon the *Norman* decision, the superior court dismissed some of Hikita's tort claims. As to others, involving personal injuries, the superior court held that they were not barred by either *Norman* or the Restatement (Second) of Judgments § 56.

We affirmed in part, reversed in part, and remanded.[5] To summarize, we held that Alaska Foods was a proper party to maintain the action; that [§ ] 56 of the Restatement did not bar Alaska Foods'[s] action; and that the tort claims of both Hikita and Alaska Foods were properly dismissed. Thus, the only issue *Hikita* left open to further proceedings was Alaska Foods'[s] claim for breach of the shareholders agreement. *Hikita* specifically allowed Nichiro to reargue the issues of res judicata and collateral estoppel.

On remand, Nichiro renewed its motion for summary judgment on grounds of res judicata. The superior court granted the motion, concluding that this case raised the same issues that were raised in *Bank of California v. Adak Aleutian* and that Alaska Foods, through Hikita, had controlled

---

**5.** *See Hikita,* 713 P.2d at 1199–1203.

that litigation. Final judgment was entered on this basis.... [6]

In appealing that final judgment, Alaska Foods argued that the Bank of California suit did not preclude it from litigating Nichiro's breach of the shareholders agreement.[7] Addressing this argument, we held in *Alaska Foods* that the superior court erred in applying Restatement (Second) of Judgment § 39 as a basis for deciding that Alaska Foods was precluded from bringing its contract claims against Nichiro.[8] We concluded that the court instead should have relied on § 59, governing corporations, since § 59 applies "whenever preclusion between a corporation and a stockholder, director, or officer is involved." [9]

We pointed out that, under § 59, judgments in actions involving corporations generally have no preclusive effects on officers, directors, or stockholders.[10] Section 59(3)(a), however, establishes an exception for closely held corporations, like Adak. A judgment in an action by such a corporation is conclusive upon a "holder of its ownership" if that owner "actively participated in the action on behalf of the corporation, unless [the owner's] interests and those of the corporation are so different that [the owner] should have opportunity to relitigate the issue." [11]

Accordingly, we remanded with directions for the court to determine whether Alaska Foods actively participated in the 1975 litigation on behalf of Adak and whether Alaska Foods had adequate incentive to pursue Adak's claims against Nichiro.[12] We noted that there was support in the record for the view that Alaska Foods lacked adequate incentive, particularly because Adak was insolvent and had more than $3.5 million in outstanding judgments against it.[13] But because the lack-of-incentive issue had not been considered by the superior court, we remanded to give Nichiro the opportunity to dispute the facts that we believed established Alaska Foods's right to bring its own case.[14]

We issued our decision in January 1989. On remand, the superior court set a November 1990 trial date. Nichiro served discovery requests on Alaska Foods in November 1989, December 1989, and March 1990.

Alaska Foods did not respond to Nichiro's discovery requests, and on April 12, 1990, Nichiro moved to dismiss Alaska Foods's suit for failure to make discovery. Alaska Foods hastily filed "responses" to the December and March discovery requests, stating that it was "attempting to ascertain the answers" to the requests for production and interrogatories and promising to submit answers or objections by May 31.

On May 11 Nichiro moved for summary judgment both on issue preclusion and on the merits. Alaska Foods responded by moving for a stay, a Rule 16 conference, or an extended period of time to reply, and told Nichiro on May 31 that it would not produce the promised discovery until the court ruled on its stay request. The court scheduled an August hearing on Nichiro's discovery-sanction and summary judgment motions. On August 23 the court denied Alaska Foods's stay-or-conference request and required it to oppose Nichiro's motions by August 31.

Alaska Foods opposed summary judgment, attaching a recent twelve-page affidavit from Takehiro Hikita, as well as a short affidavit executed by Hikita in 1986. It also opposed dismissal for discovery violations. The court heard oral argument in October; two weeks later, it issued brief orders granting summary judgment and dismissal for failure to make discovery. In response to Alaska Foods's motion to reconsider or "[a]t a minimum ... to specify the grounds upon which its decision is based," the court ordered Nichiro to submit proposed findings of fact and

**6.** *See Alaska Foods,* 768 P.2d at 118–20 (footnotes and some internal citations and quotations omitted).

**7.** *See id.* at 120.

**8.** *See id.* at 121–22.

**9.** *Id.* at 122.

**10.** *See id.*

**11.** Restatement (Second) of Judgments § 59(3)(a) (1980) [hereinafter Restatement].

**12.** *See Alaska Foods,* 768 P.2d at 123–24.

**13.** *See id.* at 124 n. 7.

**14.** *See id.*

conclusions of law. Nichiro did, and in January 1991 the court entered findings and conclusions supporting the summary judgment and discovery dismissals.

Meanwhile, in January 1990 Alaska Foods's suit against Nichiro had been consolidated with Isaac Norman's case against the company. Since the superior court's order dismissing Alaska Foods's suit did not dispose of the entire action, Alaska Foods did not have an immediate right to appeal. Nichiro and Norman finally settled Norman's claims in 1995. Nichiro moved the court in February 1997 to enter a final judgment in the consolidated Norman/Alaska Foods/Hikita litigation; the court did so in March. This appeal followed.

## III. *DISCUSSION*

### A. *Dismissal as Discovery Sanction*

■ The superior court generally has broad discretion in sanctioning discovery violations, "subject only to review for abuse of discretion." [15] But "the trial court's discretion is limited when the effect of the sanction it selects is to impose liability on the offending party, establish the outcome of or preclude evidence on a central issue, or end the litigation entirely." [16]

■ Alaska Foods appeals the superior court's dismissal for failure to make discovery. It argues, first, that it had responded to Nichiro's discovery requests. We find no merit in Alaska Foods's claim that it responded to Nichiro's discovery requests. Alaska Foods's response stated that "Plaintiff is currently attempting to ascertain the answers to this interrogatory and will submit its answer and/or objections by May 31, 1990." On May 31 Alaska Foods informed Nichiro that it would not make discovery until the court ruled on its motion for a stay. But even after the court denied this motion, Alaska Foods failed to answer Nichiro's discovery requests. A party cannot satisfy a discovery request by claiming that it is "attempting to ascertain the answers," and putting off its obligation to a later date. Accordingly, Alaska Foods is in no position to claim that it satisfied its discovery obligations by serving discovery responses. [17]

■ Alaska Foods next argues that the court could not impose discovery sanctions because Nichiro never filed a motion to compel. But under Alaska Civil Rule 37(d), if a party fails to provide answers to properly served interrogatories, the superior court may punish the disobedience with "such orders in regard to the failure as are just," including any of the actions authorized under subparagraphs (A), (B), and (C) of Rule 37(b)(2). Rule 37(b)(2)(C) provides that the trial court may issue an order "dismissing the action or proceeding or any part thereof, or rendering judgment by default against the disobedient party." Thus, Civil Rule 37(d) allows the court to impose the sanctions provided in subsection (b)—including dismissal—on the motion of a party seeking discovery, without first issuing an order compelling compliance. Because failure to respond to a discovery request "strikes at the very heart of the discovery system, and threatens the fundamental assumption on which the whole apparatus of discovery was designed," Rule 37(b) contemplates

> that in the vast majority of instances, the discovery system will be self-executing. [Such a failure] provides the propounding party with no evidence at all, no basis to begin to understand the grounds for objection, and thus no basis for a dialogue that might refine and move the discovery process forward. It is precisely because outright failures to respond to discovery halt the case development process dead in its tracks, and threaten the underpinnings of the discovery system, that subdivision (d) of Rule 37 authorizes ... courts, in responding to this kind of misconduct, ... to impose in the first instance any of a wide range of sanctions [, including dismissal]. [18]

---

**15.** *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1169 (Alaska 1998).

**16.** *Id.*

**17.** *See Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1260 (Fed.Cir.1985).

**18.** 7 James Wm. Moore et al., *Moore's Federal Practice* ¶ 37.90, at 37–141 (3d ed.1997); *see Aziz v. Wright*, 34 F.3d 587, 589 (8th Cir.1994) (holding that no motion to compel was required before dismissal pursuant to Federal Rule of Civil Procedure 37(d)).

**1176**

Accordingly, the superior court was not required to compel discovery before it sanctioned Alaska Foods's disobedience.

 Our prior cases, however, make clear that a trial court may not issue litigation-ending sanctions without first exploring "possible and meaningful alternatives to dismissal."[19] "If meaningful alternative sanctions are available, the trial court must ordinarily impose these lesser sanctions rather than a dismissal with prejudice ."[20] In this case, the superior court did not make any findings regarding alternatives. The court's findings discuss Alaska Foods's repeated failure to make discovery, note that the company failed to demonstrate its lack of willfulness, hold that Nichiro suffered prejudice, and conclude that dismissal was therefore warranted. But the findings are silent on the subject of lesser alternatives, and in the absence of proper findings rejecting such alternatives, we must vacate the sanction and remand for reconsideration.[21]

B. *Summary Judgment on Issue Preclusion*

 Our opinion in *Alaska Foods* directed the superior court to determine on remand "whether Alaska Foods'[s] involvement in the two [1975 Adak] cases constituted active participation for purposes of [Restatement] section 59(3)(a)" and "whether Alaska Foods'[s] interests and those of [Adak] [were] so different that Alaska Foods lacked adequate incentive to pursue [Adak]'s claims and thus should have the opportunity to relitigate the issues."[22]

The superior court concluded on remand that Alaska Foods had actively participated in the prior Adak litigation by developing a list of claims against Nichiro, monitoring the litigation, and eventually agreeing with the other Adak shareholders to abandon Adak's

claims against Nichiro. The court also found that, assuming Adak had a meritorious claim against Nichiro, Alaska Foods, as an Adak shareholder, had adequate incentive to pursue Adak's breach-of-contract claim against Nichiro.

Hikita insists that Alaska Foods's involvement in the Adak litigation was limited to "writ[ing] telegrams and letters and giv[ing] words of encouragement ... because we were interested in trying to see if we could not perhaps shame [Nichiro] into doing what was right." But Nichiro established that Hikita actively participated in initially planning and deciding to file Adak's suit. Also, Hikita asked Adak's attorney to keep him informed as the litigation progressed. Most significantly, Hikita testified in a deposition that he reached an agreement with the other stakeholders to abandon Adak's claims and allow the default judgment to be entered against it. These facts all tend to show that Hikita played an active role in the Adak litigation.[23]

Yet Nichiro offered no evidence indicating that Hikita participated in the fall 1975 decisions to file counter- and cross-claims against Nichiro. Such evidence might have demonstrated Alaska Foods's affirmative interest in pursuing the claims that ultimately led to the default judgment upon which preclusion in the present case depends.[24] But in our view, without evidence that Alaska Foods joined in Adak's decision to file these claims, the record fails to establish that Alaska Foods's incentive to pursue Adak's claims was sufficient to trigger preclusion under Restatement § 59.

In defending the superior court's order on preclusion, Nichiro contends that "[t]he crux of [Alaska Foods's] argument is that [it] was entitled to recover items of damage that

**19.** *Underwriters at Lloyd's London v. The Narrows*, 846 P.2d 118, 119 (Alaska 1993).

**20.** *Arbelovsky v. Ebasco Servs., Inc.*, 922 P.2d 225, 227 (Alaska 1996).

**21.** Our decision does not preclude the court from reinstating the original sanctions order if a careful consideration of lesser alternative sanctions convinces it that no sanction short of dismissal was appropriate and if the court fully explains its reasons for reaching this conclusion.

**22.** *Alaska Foods v. Nichiro Gyogyo Kaisha*, 768 P.2d 117, 124 (Alaska 1989).

**23.** *See, e.g., Alman v. Danin*, 801 F.2d 1, 5 (1st Cir.1986); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190–91 (2d Cir.1985); *Drier v. Tarpon Oil Co.*, 522 F.2d 199, 200 (5th Cir.1975) (all finding active participation where owner or stockholder played a decision-making role in litigation).

**24.** *Bank of California v. Adak Aleutian Processors, Inc.*, No. A75–182 Civ. (D.Alaska).

would not have been recoverable by [Adak]," and notes that Alaska Foods's ability "to recover damages that it would not have realized through a recovery by [Adak] is the *sine qua non* of [its] argument." Having attributed this argument to Alaska Foods, Nichiro goes to great lengths to defeat it by demonstrating that the contractual claims Alaska Foods asserts in the present case could yield no award of damages that Adak might not have obtained on behalf of its shareholders in its 1975 counter- and cross-claims. Thus, asserting that "the focus of the incentive inquiry must be on the recoverability by [Alaska Foods] of damages that would *not* be redressed through a corporate recovery by [Adak]," Nichiro insists that such damages are illusory.

But Nichiro's argument begs the crucial question. If Alaska Foods could recover nothing in the current litigation that Adak could not have recovered in its 1976 corporate claims against Nichiro, then what more could it have recovered vicariously through Adak's claims? In other words, what incentive did Alaska Foods have to press an action in Adak's name that it could pursue directly? The record provides no convincing answer. In fact, uncontradicted evidence of Adak's insolvency and of its $3.5 million in amassed debt[25] establishes that Alaska Foods had every reason *not* to press Adak's corporate claim against Nichiro.

■ Nichiro nevertheless offers the theory that Alaska Foods should have been motivated by the incentive of avoiding issue preclusion:

> [S]uccessful pursuit by [Adak] of its litigation against Nichiro would have inured directly to the benefit of [Alaska Foods] ... since, by operation of [collateral estoppel], it would have conclusively established Nichiro's liability with respect to [Alaska Foods's] ... damages arising out of [its] mismanagement and contractual breach claims. *Alaska Foods*, 768 P.2d at 120[,] 123[ ] n. 6.

But Nichiro's reasoning is circular and would nullify the second requirement of Restatement § 59(3)(a). As we explained in *Alaska Foods*, issue preclusion will apply under Restatement § 59(3)(a) if: (1) a stockholder was an active participant in the corporation's litigation; and (2) if the stockholder had adequate incentive to pursue the corporation's claims.[26] If the risk of preclusion were itself a sufficient incentive to bind a close corporation's shareholders to actions they participated in on their corporation's behalf, then their active participation would always trigger issue preclusion. Thus, Nichiro's approach is inherently inconsistent with § 59(3)(a)'s requirement that a stockholder be an active participant *and* have adequate incentive.

Indeed, we suggested as much in our prior decision:

> Due to [the $3.5 million in] unsatisfied judgments, Alaska Foods'[s] stock in [Adak] probably had little value. In the instant litigation, however, Alaska Foods may seek damages not only for the lost value of the stock, but also for "all proximate damages that can be proved with reasonable certainty." Alaska Foods alleges that Nichiro's actions caused Bank of California to foreclose on property pledged by Alaska Foods, which, "in turn led to the closing and virtual destruction of [Alaska Foods]." If this is true, Alaska Foods may have suffered damages substantially exceeding the lost value of its stock in [Adak].[27]

We thus concluded that if Alaska Foods's assertions held true, "a case of inadequate incentive to litigate would be made out."[28] On remand, Nichiro did not refute these assertions. Instead, it merely insisted that Alaska Foods had an adequate incentive to litigate because its interests aligned perfectly with Adak's. But in our prior decision we found that the record demonstrated that Alaska Foods's interests did not align with Adak's; Alaska Foods's claim as a party to the shareholders agreement was much stronger than any claim it could bring vicariously through Adak.[29] This situation contrasts with the usual scenario where the interests of a closely held corporation and its

---

25. *See Alaska Foods,* 768 P.2d at 124 n. 7.

26. *See id.* at 124.

27. *Id.* at 124 n. 7 (internal citation omitted).

28. *Id.*

29. *See id.*

stockholders are so similar that the corporation's actions effectively represent the interests of the stockholder.[30] Because Alaska Foods's interests did not align with Adak's in this sense, we conclude that it is not barred from bringing its own claim against Nichiro.

### C. *Summary Judgment on the Merits*

■ Alaska Foods argues that Nichiro violated the express terms of the shareholders agreement by failing to use its "best efforts" to achieve the corporate and business purposes of Adak. In opposing Nichiro's motion for summary judgment, Alaska Foods submitted an affidavit by Hikita in which he asserted that Nichiro had grossly mismanaged Adak and created enormous cost overruns. Alaska Foods posits that it was Nichiro's mismanagement of Adak that led to Adak's, and hence Alaska Foods's, economic ruin.

Nichiro offered nothing to rebut these assertions. Instead, it framed Alaska Foods's claim narrowly, stating that "[t]he gravamen of [Alaska Foods's] claim for breach of contract is that defendants were obligated under the Shareholders Agreement to make further loans to [Adak], but failed and refused to do so in early 1975." Nichiro explained that the shareholder's agreement provided that Nichiro would loan working capital to Adak under terms set forth in a separate agreement between Nichiro and Adak. That document, the May 13, 1974 working capital loan agreement, defined the conditions and limitations on Nichiro's obligation to loan up to $2 million in working capital to Adak. It provided that Nichiro was obligated to supply working capital to Adak for a period of ninety days beyond May 13, 1974. The loan agreement further provided that Nichiro's obligation would terminate in the "Event of Default." Nichiro established that it made payments beyond the ninety days required by the agreement and that Adak defaulted by failing to pay interest on its working capital loans. Accordingly, Nichiro accurately observed that it had not breached the loan agreement. The superior court did not err in granting summary judgment to Nichiro on this aspect of Alaska Foods's claim.

The court erred, however, in dismissing Alaska Foods's entire breach of contract claims based solely on the evidence that Nichiro had not breached the loan agreement. Alaska Foods's claims rest not only on Nichiro's failure to loan, but also on its alleged mismanagement of the plant's construction and operation, which, according to Alaska Foods, precipitated Adak's and Alaska Foods's troubles. Alaska Foods recognizes Nichiro's contention that it was' "excused from its many contractual obligations because [Adak] was in default for failing to make interest payments under the loan agreement." But Alaska Foods deems this "nothing more than a 'chicken or egg' analysis; or which came first?" Explaining that Adak "had no monies to make interest payments because Nichiro's mismanagement of construction delayed production and its mismanagement of operations ensured that revenues from production would not be sufficient," Alaska Foods asserts that Nichiro's loan and impracticability defenses are rebutted by the fact that Nichiro's mismanagement triggered all of Adak's problems.

For its part, Nichiro did not try to explain why Adak was in financial trouble or whether Nichiro had competently managed Adak before Alaska Foods's default and the bank's intervention. Indeed, Nichiro's fifty-four-page memorandum in support of its motion for summary judgment never asserted that it fulfilled its duty to exert "best efforts" in managing the venture. And in responding to Alaska Foods's opposition, Nichiro merely said:

> Equally unsupported is [Alaska Foods's] general assertion that Nichiro is to blame for the "frustration of purpose" of the contract. Plaintiff has offered no evidence to show that Nichiro caused the financial difficulties of [Alaska Foods] which *preceded* the bank's seizure and acceleration of the [Adak] notes, and which preceded, by several months, Nichiro's alleged "abandonment" of [Adak].

■ But as Alaska Foods correctly asserts, to obtain summary judgment against

---

**30.** *See NEC Elecs., Inc. v. Hurt,* 208 Cal.App.3d 772, 256 Cal.Rptr. 441, 445 (1989) (finding that the interests of a sole shareholder of a corpora-tion did not align with the corporation because the corporation was on the verge of bankruptcy and therefore had no incentive to litigate).

Alaska Foods on the best efforts claim, it was "Nichiro's obligation on summary judgment to explain to the trial court WHY [Adak] was in financial problems." A party moving for summary judgment will prevail if there is no genuine issue of material fact and the record establishes that the party is entitled to summary judgment as a matter of law.[31] The moving party bears the burden on both issues—

> the initial burden of establishing the absence of a genuine issue as to any material fact and [establishing] that, based on such undisputed fact, it [is] entitled to a judgment as a matter of law.[32]

We have repeatedly emphasized the moving party's affirmative burden:

> Because a premature grant of summary judgment forecloses a litigant's right to trial ... we must be mindful that both on appeal and at the trial level, it is the moving party that bears the initial burden of proving, through admissible evidence, the absence of genuine factual disputes and its entitlement to judgment. "[T]he party seeking summary judgment 'has the entire burden of proving that his opponent's case has no merit.'" ... [A]lthough prudent counsel for the non-moving party will always attempt to demonstrate a genuine issue for trial, it is not obligated to do so until the moving party makes a prima facie showing of its entitlement to judgment on established facts.[33]

Thus, it was not enough for Nichiro to point out that Hikita's affidavit would not be admissible at trial. To prevail on summary judgment, it carried the burden of producing evidence to establish that Alaska Foods's best-efforts claim had no merit.[34] Nichiro could not meet this burden without some affirmative showing that it had not mismanaged the plant.

Nichiro's burden was heightened by the fact that it was undisputed that Nichiro owed a contractual duty to use "best efforts." The primary issue on summary judgment was whether Nichiro had satisfied this duty. Nichiro's duty to use "best efforts" entails a standard analogous to the "reasonable care" standard in a tort case where a defendant undisputedly owes a duty:

> In cases where no one disputes the existence of a duty running from one party to another, we have disfavored summary adjudication of the precise scope of that duty, or of whether particular conduct did or did not breach it (i.e., constitute negligence). This is particularly so when the scope of the duty poses a fact-specific question, involving policy and "circumstantial judgments" that our legal system reserves for the jury.
>
> On the other hand, summary judgment is proper where the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever-or owed a duty clearly and vastly narrower in scope than the one that the other party asserts in opposing summary judgment.[35]

■ This distinction reflects the principle that, "as a practical matter, it is much harder to show that there are no genuinely disputed material facts when the existence of a duty is clear and the question is of its precise scope, or whether given conduct fulfilled it."[36] Even though Alaska Foods's claim alleges a breach of contract, rather than a tort, the "best efforts" duty that Nichiro undeniably contracted to undertake makes Nichiro's position analogous to that of a tort defendant who admittedly owes a duty of "reasonable care" and seeks summary judgment on the ground that the duty was not breached.

■ Accordingly, because Nichiro did not make a sufficient prima facie showing to rebut Alaska Foods's assertions that Nichiro's mismanagement caused Adak's demise, this case was not properly in summary judgment posture, regardless of whether Alaska

**31.** See Andrews v. Wade & De Young, Inc., 950 P.2d 574, 575 (Alaska 1997).

**32.** Howarth v. First Nat'l Bank of Anchorage, 540 P.2d 486, 489 (Alaska 1975).

**33.** Shade v. Co & Anglo Alaska Serv. Corp., 901 P.2d 434, 437 (Alaska 1995) (quoting Williams v. Municipality of Anchorage, 633 P.2d 248, 250 (Alaska 1981)).

**34.** See Nizinski v. Golden Valley Elec. Ass'n, 509 P.2d 280, 283 (Alaska 1973).

**35.** Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell, 956 P.2d 1199, 1203 (Alaska 1998) (internal citations omitted).

**36.** Id. at 1204.

Foods's assertions were based on an offer of admissible evidence. We have upheld summary judgments dismissing cases where the plaintiff's claims were based only on vague, unsupported, and inadmissible assertions.[37] But here, Hikita's affidavit contains more than vague assertions. He explains with some specificity that Nichiro's plant manager, Mr. Makino, was inexperienced and incompetent in his management, causing problems with personnel and cost overruns, and that he was unable "to deal with Alaska fishermen." Nichiro insisted on exclusive control of the plant, and, according to Hikita, steadfastly refused input from others, including suggestions that Makino needed to be replaced.[38] We therefore reverse the superior court's order granting summary judgment and remand for further proceedings on Alaska Foods's claim that Nichiro failed to use its "best efforts." [39]

## IV. CONCLUSION

It was error to impose litigation-ending sanctions without first exploring lesser alternatives. It was also error to conclude that Alaska Foods had adequate incentive to litigate Adak's claims in the prior litigation. Finally, it was error to grant summary judgment on the merits of the best-efforts claim because Nichiro failed to offer affirmative evidence establishing that it used its "best efforts to achieve the corporate and business purposes of [Adak]." We therefore VACATE the order of dismissal and REMAND for further proceedings consistent with this opinion.

COMPTON, Justice, not participating.

**37.** *See West v. City of St. Paul,* 936 P.2d 136, 140–41 (Alaska 1997); *Fomby v. Whisenhunt,* 680 P.2d 787, 792 (Alaska 1984).

**38.** Hikita's affidavit also alleged that Nichiro wrongfully abandoned the Adak facility. Nichiro did attempt to rebut this claim. Since Alaska Foods's wrongful abandonment claim appears to be subsumed within its broader claim of mismanagement, our conclusion that Nichiro failed to make an adequate prima facie showing to rebut other aspects of the allegation of mismanagement makes it unnecessary for us to consider

whether summary judgment would have been warranted had Alaska Foods asserted abandonment as a separate claim.

**39.** Alaska Foods also appeals a 1991 court order holding Hikita in contempt for failing to attend a judgment-debtor exam. In a conclusory fashion, Alaska Foods asserts that the court abused its discretion. Because Alaska Foods offers no support for this assertion, we find the issue waived for failure to brief the issue adequately. *See Martinson v. Arco Alaska, Inc.,* 989 P.2d 733, 738 (Alaska 1999).