**Ronald T. WEST, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

**No. S–12164.**

Supreme Court of Alaska.

Dec. 21, 2007.

Robert C. Erwin, Robert C. Erwin, LLC, Anchorage, for Appellant.

Joshua M. Freeman, Assistant Municipal Attorney and James N. Reeves, Municipal Attorney, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A dog bit or pawed a seven-week-old baby, causing several scratches along the baby's face and forehead. After an investigation, an Anchorage animal control enforcement officer concluded that the dog should be classified as a "level three" animal, defined by the city code as one that, "while under restraint, inflicts an aggressive bite or causes any physical injury to any human." An administrative hearing officer upheld this classification, as did the superior court. The dog's owner appeals. Because the hearing officer applied the correct burden of proof and properly interpreted the evidence, and because the decision is supported by substantial evidence, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

On April 14, 2003, Kandi Trescott was visiting Knight's Auto Radio store in Anchorage and speaking with Jeffrey Knight, the store's owner and operator, while Trescott's seven-week old baby, Ethan, lay in a carrier by her feet. The baby was covered by a blanket when Ronald West entered the store with his black and white malamute dog, Gummie, on a long leash. Upon entering the store, Gummie approached the baby. What happened next is in dispute, though undeniably it resulted in several scratches to the baby's face.

According to Trescott, Gummie inserted his head under the blanket and grasped the baby's head in his mouth. Knight testified that he did not have a clear view of the baby and did not observe what Gummie did before walking away with the baby's blanket in his teeth. West, who was further from the baby, testified that Gummie never bit the baby but merely pushed his paw under the blanket

and rubbed his paw on the baby's face enough to cause the scratches.

There was conflicting testimony as to the baby's reaction. Trescott stated that the baby cried and continued crying for several minutes until she quieted him down by carrying him around the store. West's affidavit, filed two days after the incident, indicates that he heard the baby cry. An animal control report also indicates that Knight initially told animal control that the baby had cried. However, at the administrative hearing West (and Knight) denied that the baby cried and testified that the baby was merely in shock.

After receiving Gummie's rabies tag information, Trescott, joined by the baby's father, took the baby to see Dr. Martin Beals. Beals's report described the marks on the baby's head as "[s]everal superficial red whelp-like scratch marks on [the] right cheek and one longer one on the [left] cheek." He also reported very superficial scrapes on the forehead with mild redness and wrote, "[n]o puncture wounds or deep bruising or tenderness noted."

### B. Proceedings

Trescott called animal control to report the incident on April 14, 2003, the day the incident happened, and gave a written statement to Animal Control Officer Richard Gamble. Later that day Animal Control Enforcement Supervisor Richard Novy spoke with West by telephone and informed him of the need for Gummie to be quarantined. Gummie was quarantined for ten days beginning April 15. Novy continued to investigate the incident and on April 21 classified Gummie as a "level three" animal.

Anchorage Municipal Code (AMC) 17.40.020(A)(3) states: "Level three behavior

is established if an animal, while under restraint, inflicts an aggressive bite or causes any physical injury to any human." This classification has a number of consequences, including an increase in the yearly licensing fee, requirements that warning signs be posted on the owner's property, and requirements that the dog be securely enclosed at all times or, when off the owner's property, on a leash six feet or shorter and muzzled.[1,2]

West appealed to an administrative hearing officer. After multiple continuances, a final hearing was held on April 27, 2004. On May 25, 2004, the Administrative Hearing Officer, Timothy Middleton, issued a ruling finding that Gummie warranted level three classification. Middleton specified that animal control bore the burden to prove the basis of the classification by a preponderance of the evidence, a burden which he found that it had met.

West appealed to the superior court, which dismissed the case for failure to prosecute when West did not timely file a brief and did not move the court to accept a late-filed brief. The superior court, apparently without the benefit of any briefing from West, also found that substantial evidence supported the hearing officer's decision.

### III. STANDARD OF REVIEW

Where the superior court is acting as an intermediate court of appeals, we directly review the agency decision.[3] Questions of fact are reviewed for substantial evidence.[4] Questions of law involving agency expertise are reviewed using the reasonable basis test[5] because "where an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in

1. *See* AMC 17.40.040, .090.

2. An animal classified as level three will not necessarily be subject to all of these restrictions for the remainder of its life. A level three classification may be removed, reduced, or modified upon satisfaction of several requirements including the passage of two years without further incident, completion by dog and owner of an obedience training course, and the payment of fees. AMC 17.40.085. Reclassification can result in the lifting of all restrictions except the

requirement that the animal remain in a secure enclosure when on the owner's property. AMC 17.40.085(B).

3. *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1253 (Alaska 2007).

4. *Id.*

5. *State v. Pub. Safety Employees Ass'n*, 93 P.3d 409, 413 (Alaska 2004).

promulgating the regulation at issue." [6]  We apply our independent judgment to issues of law not involving agency expertise.[7]

■ "Whether the trial court used the appropriate burden of persuasion 'presents a question of law to which this court applies its independent judgment, adopting the rule of law that is most persuasive in view of precedent, reason and policy.' " [8]

■ Finally, we review the superior court's decision to dismiss for failure to prosecute for abuse of discretion.[9]

## IV.  DISCUSSION

We conclude that the superior court did not abuse its discretion in its procedural handling of this case, but decline to rest affirmance on West's failure to prosecute. Because the hearing officer's decision is correct on the law and supported by substantial evidence, we affirm.

### A.  The Hearing Officer Applied the Correct Standard of Proof.

■ West argues that decisions under the animal control ordinance of the Municipality of Anchorage should utilize the "beyond a reasonable doubt" standard of proof instead of the "preponderance of the evidence" test that the hearing officer used in this case. West asserts that beyond a reasonable doubt is the proper standard because of the "remedial or criminal" nature of the actions under the animal control ordinance, and the "remedial penalties" that resulted from the level three classification.[10]  In so doing he mistak-

enly conflates the meaning of remedial and criminal ordinances.

West cites *State v. Von Thiele*,[11] a Washington case which determined that where a statute is remedial rather than criminal in nature, the state's burden of proof is preponderance of the evidence.  In that case, Von Thiele was charged with illegal hunting and was forced to pay restitution.[12]  West misreads the court's discussion on this matter as distinguishing "criminal or remedial" statutes on the one hand and "civil" on the other.  In fact, the court was distinguishing *between* criminal and remedial statutes, holding that the remedial nature of the restitution requirement in question made it civil in nature: "[T]he plain and unambiguous language of [the restitution provision] unequivocally demonstrates a legislative intent to provide a civil penalty system in the form of restitution for the redress of wildlife values lost because of illegal hunting.  Accordingly, [the restitution provision] is inherently remedial, rather than criminal, in nature." [13]  Thus, *Von Thiele* actually counters West's point and undermines his theory that the existence of penalties renders the animal control ordinance criminal in nature.

Furthermore, as the municipality notes in its brief, Alaska case law similarly distinguishes between sanctions that are remedial and criminal in nature.  In *Johansen v. State*[14] we distinguished between the procedural safeguards afforded defendants in civil contempt and criminal contempt proceedings, holding that civil contempt needed to be proved only by a preponderance of the evidence.[15]

6.  *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982).

7.  *See Thoeni,* 151 P.3d at 1253.

8.  *Fernandes v. Portwine,* 56 P.3d 1, 4 (Alaska 2002) (quoting *Spenard Action Comm. v. Lot 3, Block 1 Evergreen Subdivision,* 902 P.2d 766, 774 (Alaska 1995)).

9.  *See Géczy v. State, Dep't of Natural Res.,* 924 P.2d 103, 104 (Alaska 1996).

10.  West also cites the due process clause of the Alaska Constitution to support this point.  West offers no support for the assertion that the due process clause entitles him to a specific standard of proof in an animal control case and we there-

fore deem the argument to be waived.  *Hikita v. Nichiro Gyogyo Kaisha, Ltd.,* 12 P.3d 1169, 1180 n. 39 (Alaska 2000) (concluding issue waived where party offered no support for assertion).

11.  47 Wash.App. 558, 736 P.2d 297, 300 (1987).

12.  *Id.*

13.  *Id.* at 301.

14.  491 P.2d 759 (Alaska 1971).

15.  *Id.* at 766–67.  The burden to show non-compliance is borne by the plaintiff.  However, once non-compliance has been proven by a preponderance of the evidence, the burden shifts to

No Alaska case law supports West's position that the classification hearing was criminal in nature, or that it should result in a beyond a reasonable doubt standard of proof. West cites *Sinclair v. Okata*,[16] where the federal district court characterized an Anchorage ordinance on animal control as "unequivocally aimed at preventing attacks and bites by dogs."[17] However, *Sinclair* said nothing about the statute's "criminal nature" or the burden of proof required for proving an injury in an administrative hearing. Indeed, the dog owner in *Sinclair* was held negligent per se for injuries caused by his dog when it was not under voice control.[18]

Finally, the context of the ordinances confirms that the animal control regulations are not criminal in nature. The entire structure for providing an animal control hearing on an animal classification in AMC 17.05.100 utilizes the administrative adjudication procedures of AMC 03.60. The civil nature of the ordinance is further clarified by the fact that the former provision on "crimes and penalties" in AMC 17.40 now is contained in the criminal provisions of the AMC,[19] separating it from the rest of animal control regulations. The criminal provision of the animal behavior regulation provides that an owner is subject to criminal penalty if she or he violates "with criminal negligence" the requirements of the animal classification pertaining to animals classified at level three or higher.[20] Thus, while Gummie's initial classification is an administrative matter conducted under standard administrative procedures, any alleged criminal violation of the terms of the classification by West would result in a separate trial in which West would be afforded full criminal defendant protections.

Because the hearing classifying Gummie was not a criminal proceeding but instead an administrative one, the hearing officer properly used the preponderance of the evidence standard.

## B. The Hearing Officer Properly Interpreted the Ordinance.

■ West argues that the hearing officer improperly interpreted the ordinance guiding classification of level three animals. The relevant provision states: *"Level three behavior is established if an animal, while under restraint,* inflicts an aggressive bite or *causes any physical injury to any human."*[21] West argues that the clause "causes any physical injury to any human" should be interpreted as requiring that the animal *aggressively* caused "any physical injury."

West relies on the statutory construction rule of *ejusdem generis,* which has been explained as follows:

> [W]hen a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed. For example, in the phrase *horses, cattle, sheep, pigs, goats, or any other farm animal,* the general language *"or any other farm animal"*—despite its seeming breadth—would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens.[22]

However, as the municipality notes, the language of AMC 17.40.020(A)(3) does not contain a "list of specifics" preceding the phrase "or causes any physical injury...." Instead, only the specific act of an "aggressive bite" precedes "or causes any physical injury to any human." We agree that this lack of a list means that *ejusdem generis* does not apply.

Additionally, the plain meaning of the sentence is not ambiguous, and thus no statutory

---

the defendant to prove, by a preponderance of the evidence, an inability to comply with the order.

**16.** 874 F.Supp. 1051 (D.Alaska 1994).

**17.** *Id.* at 1063.

**18.** *Id.* at 1064.

**19.** This provision can now be found at AMC 08.55.060.

**20.** *Id.*

**21.** AMC 17.40.020(A)(3) (emphasis added).

**22.** Black's Law Dictionary 556 (8th ed.2004).

aids need apply. In *Crump v. State*[23] we clarified the role of *ejusdem generis* when we declined to apply the canon to a kidnapping statute:

> Ejusdem generis is not a rule of law, but rather an aid to the interpretation of statutes that are ambiguous or that leave unclear the legislative intent. Here ejusdem generis is not appropriate because the statute is not ambiguous.[24]

Similarly, there is nothing about the wording of AMC 17.40.020(A)(3) that makes it ambiguous. The terms "aggressive bite" and "physical injury" are both defined in the ordinance.[25] Finally, it is grammatically incorrect to conclude that the word "aggressive" modifies any part of the phrase "or causes any physical injury to any human."

Reading level three classification as including any physical injury to any human also fits logically within the context of the classifications. The less-sanctioned level two behavior "is established if an animal bites or causes physical injury to any domestic animal, or if an unrestrained animal kills any unrestrained domestic animal."[26] Thus, at level two, no injury to any human is contemplated. Similarly, level four behavior occurs when an *unrestrained* animal inflicts the same harm described in level three.[27] Level five behavior is established if "[a]n animal, regardless of whether it is restrained, causes *serious* physical injury or the death of any human...."[28] As would be expected, levels four and five contemplate more serious behavior than occurred here, and level two contemplates less serious behavior.

West argues that the hearing officer's interpretation could result in an animal's classification for injuries that it causes inadvertently. But the ordinance mitigates this risk by providing a list of nine exceptions to the classifications[29] including injury resulting from the animal acting out of pain, protecting its young, playing with the family that owns it, and a general exception for when "[t]he decision not to classify reasonably serves and promotes justice, fairness, and the purposes and intent of this title, the protection of public health, safety and welfare, and the humane care and treatment of animals."[30] Given the plain meaning of AMC 17.40.020(A)(3), its context, and the exceptions to the classifications, the hearing officer properly interpreted the ordinance to apply to any physical injury to a human.

## C. The Hearing Officer's Decision Was Supported by Substantial Evidence.

▮ In order to uphold the administrative decision, we must determine whether the hearing officer's decision was supported by substantial evidence. As noted above, level three classification required a determination that an animal under restraint caused "any physical injury to any human."[31] The municipal code defines physical injury as "an impairment of physical condition or pain that is accompanied by scrapes, cuts, punctures or other evidence of similar injuries."[32]

It is uncontested that (1) Gummie was restrained[33] and (2) Gummie's actions result-

23. 625 P.2d 857 (Alaska 1981).

24. *Id.* at 859 (citations omitted).

25. AMC 17.05.010. The definition of physical injury is discussed at greater length below. *See infra* Part IV.C.

26. AMC 17.40.020(A)(2).

27. Level four behavior is established if any of the following occur:
   a. An unrestrained animal inflicts an aggressive bite or causes physical injury to any human; or
   b. An unrestrained animal kills a domestic animal that is restrained; or
   c. An animal, regardless of whether it is restrained, for the second time injures or kills a domestic animal.

AMC 17.40.020(A)(4).

28. AMC 17.40.020(A)(5)(a) (emphasis added).

29. AMC 17.40.020(B).

30. AMC 17.40.020(B)(9). West did not appeal the discretionary determination not to except Gummie from the classification on this basis.

31. AMC 17.40.020(A)(3).

32. AMC 17.05.010.

33. The fact that Gummie was on a leash was apparently uncontested at the hearing and is not on appeal now.

ed in several scratches to the baby's face, though they were not deep.[34] All parties agree that Gummie did not display aggressive characteristics such as "snarling, baring teeth, growling, [or] snapping." Thus, Gummie did not inflict an "aggressive bite,"[35] but inflicted physical injury if the scrapes were accompanied by pain.

The witnesses disagreed about the baby's reaction, which is important for satisfying the "pain" element of the physical injury definition. Trescott testified that her baby was crying, while Knight and West testified that he did not cry out and was merely in shock. The hearing officer found Trescott's testimony on the baby's reaction to be more credible "because she had a better view." On appeal, West contends that this is false because Knight was standing next to the baby. However, Knight's own testimony indicated that he believed Trescott had the better view:

I think [Trescott] may have seen more [than me]. She was pretty concerned about the baby. Where the baby was and everything. She was constantly looking down at the baby while she was talking to me. . . .

Additionally, testimony that the baby remained silent is contradicted by other parts of the record. In West's affidavit to Anchorage Animal Control, made two days after the incident, "I was unaware there was even a baby present until the baby cried." Similarly, the animal control report of a conversation with Knight the day after the incident states that "[Knight] said West came thru the door with his dog and then when he (Knight) heard the infant start crying he looked over in the direction of the infant, and saw the dog with the blanket in its mouth."

Finally, the hearing officer's decision involves a credibility determination that we leave to the trier of fact.[36] West cites several cases from foreign jurisdictions to argue

that the hearing officer should be required to articulate more of his reasoning. In this case, the hearing officer did clearly articulate his reasoning—Trescott was in the best position to view the baby and thus was more credible on the issue of the baby's injuries and reaction. Moreover, we have stated in workers' compensation cases that credibility determinations do not require substantial findings of fact on the record:

Credibility decisions regarding witness testimony, however, are uniquely within the province of the Board and it is not our task on review to reweigh them. There is less need, then, for extensive findings of fact regarding witness credibility. Our task when reviewing a Board decision is to ascertain whether it was based upon substantial evidence, evidence which a reasonable mind might accept as adequate to support a conclusion.[37]

The hearing officer's conclusion that the mother was more observant of her baby at the time of the incident and more accurately remembered her baby's reaction is supported by substantial evidence. Trescott testified, "My memory is not faulty. That memory is never going to go out of my mind. I will probably remember that when my son is 30 years old, how lucky I was that that dog did not decide to bite down and crush Ethan's skull." Certainly a reasonable mind could have been persuaded by that testimony.

The hearing officer concluded that Gummie, while restrained, caused a physical injury (the uncontested scrapes) which resulted in pain (as evidenced by the crying). Both elements of this determination were supported by substantial evidence and are thus affirmed.

## V. CONCLUSION

We AFFIRM Gummie's classification because the decision of the hearing officer was

34. In West's brief he focuses on the alleged manner in which Gummie caused the scratches. Because the level three classification did not depend on whether or not the injury was caused by Gummie's paw or his teeth, it is irrelevant whether this specific element of the officer's decision was supported by substantial evidence.

35. See AMC 17.05.010. If Gummie had inflicted an "aggressive bite," the municipality would not have had to prove any physical injury.

36. See Fyffe v. Wright, 93 P.3d 444, 450–51 (Alaska 2004).

37. Whaley v. Alaska Workers' Comp. Bd., 648 P.2d 955, 958 (Alaska 1982).

correct on the issues of law and supported by substantial evidence.

BRYNER, Justice, not participating.

EASTAUGH, Justice, dissenting in part.

EASTAUGH, Justice, dissenting in part.

To illustrate my disagreement with what the court seems to say about the municipality's animal control ordinance, consider two leashed dogs, both walking with their masters on a municipal sidewalk. The first, without provocation, suddenly administers an aggressive bite to a pedestrian. The second clumsily and without aggression bumps into a pedestrian and knocks him down, causing a painful break in the skin. No doubt the municipality has a legitimate interest in the safety of both pedestrians, and can regulate the behavior of both animals.

It should be obvious that there are legally significant distinctions between the conduct, behavior, and mental states of the two animals. Likewise, there are legally significant distinctions between the probability and magnitude of risk each animal poses and between the consequences to their respective victims. But the subsection of the ordinance pertinent here, Anchorage Municipal Code (AMC) 17.40.020(A)(3), draws no such distinctions. It treats the aggressive biter the same as the clumsy oaf. It does so because subsection .020(A) classifies the aggressive biter the same as an animal that causes "physical injury" to any human, and because AMC 17.05.010 defines "physical injury" to include scrapes, cuts, and "similar injuries."[1]

It is equally undiscriminating in requiring the same protective measures for each animal. Both the biter and the oaf must now wear muzzles when they are not on their owners' property,[2] even though the oaf did not use his teeth or mouth (or even his paws).

I agree with most aspects of today's opinion but write separately to address two significant problems inherent in AMC 17.40.020(A)(3). Both raise questions about the rationality of the ordinance's behavioral classifications and the required remedial measures. And both problems make arbitrary enforcement likely, if not inevitable.

West tersely but adequately raises the classification issue by arguing that it makes "no sense" to classify Gummie as level three for having scratched the baby with his paws, without aggressively biting the infant. West also argues that physical injury "can flow from very minor to major without aggression or intent by the animal." He contends that "[t]he classification would be proper if the injury was aggressively caused which would clearly rule out incidental or accidental contact resulting from the dog stepping on, pushing, playing [with] or even licking a child." Because the hearing officer found that Gummie administered the marks with his mouth, and that there was thus a "bite," West's assertion that the scratches were pawmarks is unavailing absent clear error. West does not challenge the rationality of muzzling Gummie, even though he argues that Gummie must have used his paws, rather than his mouth. The essence of West's classification argument nonetheless remains viable because the ordinance treats the aggressive dog the same as the unaggressive dog. It treats the soft-mouthed retriever that accidently scratches someone with its teeth the same as the dog that aggressively bites its victim.[3]

West also contends that "aggressive" in AMC 17.40.020(A)(3) modifies both "bite" and "any physical injury."[4] The court re-

---

1. The applicable definition does not distinguish between broken-skin injuries caused by paw, mouth, or exuberant behavior. It defines "physical injury" as "an impairment of physical condition or pain that is accompanied by scrapes, cuts, punctures or other evidence of similar injuries." AMC 17.05.010.

2. AMC 17.40.040.

3. The hearing officer found that Gummie administered a bite that was not aggressive.

4. AMC 17.40.020(A)(3) provides:

   A. *Classifications.* Subject to the authority of the chief animal control officer under subsection B below, an animal may be classified based on one of the following levels:

   . . . .
   3. *Level three behavior* is established if an animal, while under restraint, inflicts an aggressive bite or causes any physical injury to any human.

jects that contention.[5] Because West's reading is so obviously contrary to the plain words of the ordinance, I agree with the court's reading of the ordinance.

But West also argues that the reading the hearing officer and superior court gave the subsection, and thus the reading this court adopts today, "makes no sense." Because the subsection's text mandates the reading this court gives it here, West's argument necessarily raises the question whether the ordinance as written "makes sense." The court does not squarely hold that it does, but its opinion implies that the subsection rationally treats an animal that administers an "aggressive bite" the same as an animal that "causes any physical injury to any human."[6] Thus, it asserts that reading the level three classification to include any physical injury to humans "fits logically" within the context of the classification.[7]

I disagree with this assertion. If future readers would regard this assertion as mere dictum, and would not be deterred from challenging the substance of the ordinance on grounds of irrationality, no further discussion would be needed. But there is a danger the court's words might be read by future courts, and by the municipality itself, as an endorsement of the subsection's validity. Moreover, there is a danger the court's words today would be read to apply even to animals whose behavior is unambiguously passive and innocent. And indeed, the seeming precision of the subsection's words, in context of the seemingly comprehensive ordinance, might give the appearance that the animal control law was carefully crafted.

The court asserts that the classification exceptions prevent the ordinance from being improperly applied.[8] But no specific exception applies to the clumsy oaf that accidentally trips the pedestrian and causes physical injury. And the ordinance's general exception, AMC 17.40.020(B)(9), does not adequately mitigate the risk of misclassification. The general exception gives the animal control officer authority "to refrain from classifying an animal" even if it engaged in behavior specified in subsection .020(A) if the officer determines that "[t]he decision not to classify reasonably serves and promotes justice, fairness, and the purposes and intent of this title, the protection of public health, safety and welfare, and the humane care and treatment of animals."[9] Because this exception fails to articulate a meaningful standard that could be used to evaluate whether a misclassification has occurred, I do not see how this exception mitigates the risk of misclassification.

This standardless exception also necessarily invites arbitrary enforcement. Perhaps the municipality would be reluctant to require the clumsy or exuberant animal to be muzzled, and would even be reluctant to classify it the same as the aggressive biter. But the general exception contains no principled basis for avoiding classifications that either are required by the plain words of subsection .020(A) or are consistent with the eight other exceptions in subsection .020(B), some of which contain limitations on the exceptions.

The other classification levels are equally flawed. For example, level four deals with unrestrained animals. There is no exception for the exuberant, unleashed dog that trips a hiker, causing a minor laceration; the ordinance mandates a level four classification for this animal, just as it does for an unleashed dog that aggressively bites.[10]

It is facially arbitrary and irrational to treat the aggressive animal the same as the nonaggressive animal, and to treat inadvertently caused injuries the same as those

5. Op. at 228.

6. Op. at 228–29.

7. Op. at 229.

8. Op. at 229–30. The court states that the nine exceptions "includ[e] injury resulting from the animal ... playing with the family that owns it." Op. at 229. There is no "playing" exception as such, and the exception for the owner and the owner's family expressly excludes "a minor who is not involved in training or competing with the animal." AMC 17.40.020(B)(8)(b). Consequently, the family dog that, without aggression, harms a family minor during play is not excepted.

9. AMC 17.40.020(B)(9).

10. AMC 17.40.020(A)(4)(a); AMC 17.40.020(B).

caused by aggression. I therefore dissent from the court's opinion to the extent it states that subsection .020(A)'s classification scheme makes sense or that classifying as level three an animal that unaggressively causes any physical injury fits "logically" within the "context" of the classification.